# INDEX OF EXHIBITS

**EXHIBIT 1**: Navajo Nation Order

**EXHIBIT 2**: Declaration of Rita Bratcher

**EXHIBIT 3**: Declaration of Steven D. Tilley

**TAB A**: NARA Archival Storage Standards

**TAB B**: NARA Security for NARA Holdings

**EXHIBIT 4**: Declaration of Gregory Pomicter

**EXHIBIT 5**: Declaration of Bruce Maytubby

**EXHIBIT 6**: Declaration of Richard Fielitz, Jr.

**EXHIBIT 7**: Declaration of Paulette Sanford

**EXHIBIT 8**: Declaration of Julia Langan

**EXHIBIT 9**: Mapquest Directions From Oklahoma City, OK to Anadarko, OK

# EXHIBIT 1

# NAVAJO NATION ORDER

# In The United States Court of Federal Claims

No. 06-945L

(Filed: September 10, 2007)

NAVAJO NATION
f.k.a. NAVAJO TRIBE OF INDIANS,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**ORDER**

This matter comes before the court on plaintiff's Motion for Entry of Record Retention Order. Pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions, *see Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-137 (2004), the court hereby **ORDERS** as follows:

1. **General Obligation to Preserve.** During the pendency of this litigation or until further order of the court, defendant and its departments, agencies, employees, agents, and contractors must take reasonable steps to preserve every document, datum, or tangible thing in its possession, custody, or control containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation ("Relevant Records"). Plaintiff is reminded that it also has a similar duty to preserve evidence relevant to this case.

2. **Document Inspection and Production.**

   (a) Defendant shall move Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior ("Interior") Manual Part 303, Chapter 6, and located at the Bureau of Indian Affairs ("BIA") Navajo Regional ("Gallup") Office, the BIA Navajo Regional Realty Office, and the BIA Fort Defiance Agency, and any predecessor offices therefor to the Gallup BIA Warehouse in Gamerco, New Mexico, at which location such records shall be made available to plaintiff for purposes of inspection. At least 10 calendar days

before movement of the records from their present locations to Gamerco, defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

(b) After reviewing the above inactive Relevant Records for privileged material, if necessary, defendant shall make those records available for plaintiff's inspection, in accordance with the following schedule:

(i) Within 35 days after entry of this order, defendant shall provide to plaintiff any and all existing indices and inventories that include inactive Relevant Records or boxes thereof located at the above offices in the most useable form readily available. Defendant shall provide to plaintiff additional or supplemental indices or inventories of inactive Relevant Records within 21 days after the creation or discovery of such indices or inventories.

(ii) Within 35 days after receiving such indices or inventories from defendant or within some other time as agreed to by the parties, plaintiff shall designate boxes or records listed in the provided indices or inventories that plaintiff wishes to review for Relevant Records.

(iii) Within 63 days after the date on which plaintiff designates which boxes of one or more of the above offices it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the BIA warehouse in Gamerco.

(iv) Plaintiff generally shall have 63 days within which to inspect a designated record upon receiving notification from defendant that the designated record has become available for inspection, during which process plaintiff may identify records for production. This inspection period may be extended by agreement of the parties or by the court for good cause shown. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including without limitation through the use of audio recorders, digital cameras, or document scanning, provided that no such recordings made by plaintiff shall constitute production of records. Plaintiff's documentation shall be subject to the Protective Order entered by this court on May 11, 2007.

(c) After plaintiff has inspected and identified records for production pursuant to paragraph 2(b) above, defendant may move those records to the American Indian Records Repository ("AIRR") in Lenexa, Kansas, in accordance with defendant's

procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual. After such move(s), defendant shall scan the records identified by plaintiff; code the scanned images at the document level, including data fields as agreed to by the parties; and provide such images and coding to plaintiff within such schedule as agreed to by the parties. For documents originating in media other than paper, defendant shall provide the document in a reasonably usable form, including any form reasonably requested by plaintiff, and also shall provide an opportunity to plaintiff to test or sample such documents upon reasonable request. Defendant shall expedite and prioritize the scanning, coding, and production to plaintiff of identified records.

(d) In accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual, defendant may move any boxes that have been either: not designated for inspection within the time period provided for in or agreed to under paragraph 2(b)(ii); or designated but not reviewed by plaintiff within the applicable period provided for under paragraph 2(b)(iv). Nothing herein prevents plaintiff from also seeking to inspect records from the above offices in whatever location they may be found in the future.

(e) Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System ("BISS") data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to such BISS database at the Albuquerque office of plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders or digital cameras, provided that no such recordings made by plaintiff shall constitute production of records. Defendant also shall provide to plaintiff all manuals, training materials, and similar documents created by or for Interior which describe the BISS database and its manner of operation and access. Defendant shall provide to plaintiff additional or supplemental indices or inventories for the AIRR that include Relevant Records promptly after the creation of such indices or inventories.

(f) The parties shall meet and confer to discuss schedules and procedures to be used for defendant to make available to plaintiff, for purposes of inspecting active or inactive Relevant Records (determined as of the date of this order) of all of defendant's departments, agencies, offices, employees, agents, and contractors at offices other than those identified in paragraph 2(a) above, as follows:

(i) The parties shall expedite and prioritize inspection of Relevant Records that, as of the date of this order, are inactive and located at: (1) the offices

of the BIA Chinle Agency, the BIA Western Navajo ("Tuba City") Agency, the BIA Eastern Navajo ("Crownpoint") Agency, and the BIA Shiprock Agency, whether inspected at those offices, the BIA Gamerco warehouse, or other mutually agreed locations; (2) the Office of Trust Records ("OTR"), the Office of the Special Trustee ("OST"), and the BIA Land Titles and Records Office ("LTRO"), all located in Albuquerque, New Mexico; or (3) offices of the Department of the Treasury.

(ii) Defendant, after reviewing the records for privileged material, if necessary, shall make the respective record collections available to plaintiff for purposes of inspection and designation. Unless otherwise agreed by the parties, defendant shall provide existing indices or inventories for such records as soon as practicable and make such records available for plaintiff's inspection within 63 days of plaintiff's designation of them.

(iii) Plaintiff shall inspect the records upon receiving notification from defendant that the records have become available for inspection. If plaintiff identifies records for production, defendant shall make arrangements for scanned and coded images, or other data in a reasonably usable form, to be delivered to plaintiff as soon as practicable.

(iv) Unless otherwise agreed by the parties, moves of Relevant Records that are inactive as of the date of this order from the BIA Navajo Agencies identified in paragraph 2(f)(i) above, the OTR, the OST, and the LTRO to locations other than the AIRR shall be subject to the intermediate move plan requirement of section 2(a) above.

(g) The parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Relevant Records in a manner that will minimize the disruption of ongoing governmental activities.

3. **Indexation and Inventorying.**

(a) Within 126 days after entry of this order, the parties shall identify all of their respective repositories besides the AIRR and those addressed in section 2(a) above that are reasonably anticipated to be subject to discovery in this case and determine whether indices or inventories exist for each location. The parties also shall have ongoing duties to identify evidence relevant to this case in their respective possession, custody, or control.

(b) Within the same time period or as the parties may agree, the parties shall provide to each other existing indices and inventories for such repositories in the most

useful form readily available, except for indices and inventories previously provided pursuant to paragraph 2 of this Order.

(c) If a party is unable to provide the other with indices or inventories of its repositories containing evidence relevant to this case, then the parties shall meet and confer as soon as practicable about the possibility of using, as may be appropriate, a collection-by-collection approach, including on-site reviews, to address the sufficiency of existing indices or inventories and to discuss whether additional indexation of specific record collections is necessary and the scope, timing, and method of any additional indexation or elaboration of inventories at each location based on the particular facts relating to each repository and record characteristics. The parties shall provide additional or supplemental indices or inventories that include evidence relevant to this case within 21 days after the creation or discovery of such indices or inventories.

(d) The parties shall cooperate in good faith to attempt to reach agreement on all issues regarding the indexation and inventorying of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(i) the extent of the indexation and inventorying obligation, identifying the types of material to be indexed and inventoried, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

(ii) the identification of persons responsible for carrying out the indexation or inventorying;

(iii) whether indexation or inventorying will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(iv) the timing of the indexation or inventorying process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

(v) the methods to index or inventory any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(vi) the anticipated costs of indexation and inventorying and ways to reduce or share these costs; and

(vii) policies and procedures to review and modify the indexation and inventorying obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

(e) If, after conferring to develop an indexation plan, counsel do not reach agreement on the subjects listed under paragraph 3(d) of this order or on other material aspects of indexation, the parties shall file expeditiously with the court a statement of the unresolved issues together with each party's proposal for their resolution of the issues.

4. **Compliance.** The parties shall establish policies, procedures, and controls for monitoring compliance with this order and, on or before 63 days after entry of this order, file a status report with the court describing those policies, procedures, and controls. The parties' counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.*, the destruction or loss of documents).

5. **Definitions.** For purposes of this order:

(a) "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes. The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

(b) "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, mutation, negligent handling, or intentional mishandling of any documents, data, or tangible things, if such action would make that material incomplete or inaccessible.

6. **Further Instructions; Modification.**

(a) If, after counsel confer, unresolved issues remain but require resolution concerning matters arising under this order or other material aspects of preservation, inspection and production, or indexation and inventorying, the parties shall file with the court a statement of the unresolved issues together with each party's proposal for their resolution.

(b) Either party also may apply to the court for further instructions regarding, *inter alia*:

(i) defendant's obligation to preserve specific categories of documents, data, or tangible things;

(ii) any aspect of the inspection or indexation tasks not herein clearly defined; and

(iii) allocating copying costs and maintaining the confidentiality of information contained in various records.

(c) Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7. **Sanctions.** Failure to comply with this order may lead to the imposition of sanctions. *See Pueblo of Laguna*, 60 Fed. Cl. at 135-137; *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007).

8. **Dissemination.** This order shall be distributed by defendant and plaintiff to all relevant agencies, departments, offices, divisions, contractors, and individuals.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

# EXHIBIT 2

# DECLARATION OF RITA BRATCHER

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KAW NATION OF OKLAHOMA<br>*Plaintiff,*<br>v.<br>UNITED STATES OF AMERICA<br>*Defendant.* | ) | No. 06-cv-00934 L<br>Judge Francis M. Allegra |

**DECLARATION OF RITA BRATCHER**

I, Rita Bratcher, hereby declare, pursuant to 28 U.S.C. §1746, as follows:

1. I am currently employed by the Department of the Treasury, Financial Management Service ("FMS"), as the Assistant Commissioner, Debt Management Services. I have been employed at FMS for over 35 years, and I served as the Document Production Coordinator for the *Cobell* litigation from March of 1999 through April of 2003. *Cobell v. Kempthorne,* No. 1:96CV01285 (JR). As the Document Production Coordinator, under the direction of the Commissioner of FMS, I coordinated efforts within FMS related to the "Paragraph 19" search in support of the Defendants' Response to the Court's First Order for the Production of Information, and the development of FMS' Inventory of Summary Level Accounting Records, dated June 21, 2000.

2. The "Paragraph 19 search" refers to an effort undertaken in response to a document request in *Cobell* which called upon the Government to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM

[Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest."

3. I have personal knowledge of FMS's document production protocols and efforts with respect to Indian litigation. The facts set forth below are true to the best of my information, knowledge, and belief, or are as provided to me by employees of FMS based on their knowledge, information, and belief.

4. This declaration is based on my knowledge of FMS's documents, systems, and retention and preservation protocols and practices, my general familiarity with the process used to plan and execute the Paragraph 19 search in *Cobell*, and facts about that search gathered by others that were included in Treasury's Paragraph 19 Document Production Report, filed in *Cobell* on January 31, 2001.

5. I understand that it is Plaintiff's position that all documents subject to the retention order issued in this case ("Relevant Documents") are to be moved to Pawnee, Oklahoma. I further understand that the "Relevant Documents" are those "containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation." Document Preservation Order at 1.

6. Treasury's retention and preservation protocols and practices have been designed to retain a much larger group of documents than would be considered "Relevant Documents," because Treasury is unable to pinpoint with accuracy its "Relevant Documents." Treasury's difficulty in identifying its "Relevant Documents" stems

primarily from the fact that Treasury's program activities and related documents do not match up well with Plaintiff's claims.[1]

7. As an example, Plaintiff's case concerns Plaintiff, the Kaw Nation. However, the documents Treasury is retaining do not, as a general matter, identify a specific tribe. Instead, since 1973, most of Interior's reporting to Treasury has been at the level of the "Tribal Trust Fund," one account in Treasury's Government-wide accounting system. Whether or not such documents are "Relevant Documents" is unclear; however, in an abundance of caution, Treasury has instructed its employees to retain these documents.

8. This level of reporting is similar to that done by Interior for the Individual Indian Money ("IIM") accounts at issue in *Cobell*. (For those, Interior reports at the level of the "Individual Indian Money" fund.) As a result, the effort to locate "Relevant Documents" for this case would be substantially similar to the effort to locate "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM [Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest." The Paragraph 19 search done in *Cobell*, therefore, provides a useful reference for evaluating the work, time, and cost that would be involved in finding the documents Plaintiff asserts should be moved to Pawnee, Oklahoma.

9. Treasury's Paragraph 19 search was designed to locate documents pertaining to the IIM accounts of particular individual Indian beneficiaries. A search of the same records collections would be conducted in looking for the records of an Indian

---

[1] The claims asserted relate predominantly to activities by the Department of the Interior, for which Treasury happens to be in possession of some documentation (most of which consists of duplicate copies of documents in the possession, custody, or control of the Department of the Interior).

tribe, such as Plaintiff in this case. The attached Executive Summary of the Department of the Treasury Paragraph 19 Document Production Report prepared and filed in connection with the *Cobell* case, describes, in summary fashion, the methodology for the Paragraph 19 search and some of the burdens that it entailed.

10. In 1999, Treasury began a comprehensive search for documents responsive to Paragraph 19. The search took 14 months, required research at 37 facilities in 24 cities, considered over 6 billion records, involved the work of 2,200 people, and cost over $3,900,000. For all this effort, the search found only 2,296 documents, for five individuals and their predecessors in interest.

11. If Treasury were required to repeat a Paragraph 19-type search to locate "Relevant Records" to be moved to Pawnee, Oklahoma, I would recommend that Treasury prepare a search protocol and plan as it did in 1999. Treasury would in all likelihood hire a contractor to assist in development of the plan. I estimate that it would take several months to prepare a thorough search plan, depending on the search scope (including locations to be searched), the contractor's schedule, cost, and other factors.

12. The burden of undertaking a new Paragraph 19-type search would depend on assumptions in the search plan, and Treasury would propose a somewhat different plan than it used in 1999-2000 in *Cobell* by requesting that the Court impose appropriate limitations on the search, based on an analysis of the cost and burden of the search as compared to the likelihood of finding discoverable documents in certain types of record collections (for example, the Complaint in this case is unbounded in time, and therefore implicates all active and historical documents of the Department). However, if the Court

required Treasury to undertake the same search again,[2] based on my experience with the planning and execution of the Paragraph 19 Report and my review of that Report, I estimate that the following data contained in the Paragraph 19 Document Production Report would roughly approximate some of the burden involved in the new search:

a. During the Paragraph 19 production, Treasury searched 84,730 cubic feet of records (about 188 million pages) at the National Archives. These records took thousands of hours to search and contained only 1,573 responsive documents.

b. During the Paragraph 19 production, Treasury searched 374,072 cubic feet of records (about 1 billion pages) at Federal Record Centers in 11 different locations. These records took thousands of hours to search and contained no responsive documents.

c. During the Paragraph 19 production, Treasury searched 454 boxes at Federal Reserve Banks in 8 cities. No responsive documents were found.

d. During the Paragraph 19 production, Treasury searched 250 boxes of check-related records, and 3 billion check-related records that can only be searched with predicate information from the Interior Department (check symbol and serial number). The search found 222 checks and 492 check-related records.

---

[2] The search procedure would be the same except for substituting "Kaw Nation" for the five named Plaintiffs and their predecessors in interest in *Cobell*. Although there would only be one name being searched, and therefore certain aspects of the search would be less time consuming, other aspects of the search would be more time consuming because of the greater number of disbursing officers servicing the tribe over time, so I estimate that the search time would be similar.

13. The cost of conducting another Paragraph 19-type search is difficult to estimate, because it depends heavily on assumptions in the search plan, such as the locations to be searched, the years to be searched, and many other factors; however, the original Paragraph 19 search, which is similar in scope to the search that would be required to locate all "Relevant Documents," cost approximately $3.9 million.

14. In addition to the burdens described above, attempting to locate and move all "Relevant Documents" would substantially disrupt Treasury Department operations, in that human resources currently performing core Treasury functions would need to be diverted to assist in the planning and execution of the search. While contractors were used for some portions of the Paragraph 19 search, thousands of hours were devoted by Treasury personnel to the search as well, which extended over 14 months.

15. In summary, the search and other measures required by Plaintiff's position that Treasury's "Relevant Documents" are required by the Order to be moved to Pawnee, Oklahoma, would impose heavy burdens on Treasury, in terms of dollar cost and the diversion of human and other resources from the day-to-day operations and responsibilities of the Department.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of January, 2008.

Rita Bratcher

# EXHIBIT 3

# DECLARATION OF STEVEN D. TILLEY

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE KAW NATION OF OKLAHOMA<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-934 L<br>Judge Francis M. Allegra |

---------------------------------------------------

DECLARATION OF STEVEN D. TILLEY

I, Steven D. Tilley, do hereby declare:

1. I hold the position of Director of the Textual Archives Services Division in the Access Programs unit of the Office of Records Services, Washington, DC, National Archives and Records Administration (NARA), located in College Park, Maryland. I have been the Director of the Textual Archives Services Division since August 2004. I am responsible for all reference, processing, and preservation work on the permanently valuable textual records in NARA's legal custody (*i.e.,* our archival paper holdings) in our headquarters facilities located in College Park and Washington, DC. Among my overall duties, I supervise a staff of approximately 180 archivists and other personnel. Prior to my present position, I served as the Chief of the Special Access and FOIA Staff in the Textual Archives Services Division from 1997 to 2004. From 1993 to 2004, I served as the Director of the President John F. Kennedy Assassination Records Collection.

2. I am generally familiar with *The Kaw Nation of Oklahoma v. U.S.* lawsuit, the Court's Document Preservation Order ("Preservation Order") of October 24, 2007, and

the parties' subsequent filings in connection with defendant's motion to modify the Court's Preservation Order. I am submitting this declaration to provide the Court with additional information on the scope of NARA's holdings and to apprise the Court of the extraordinarily burdensome nature of plaintiff's demand for wholesale transfer and/or copying and shipping of records to Pawnee, Oklahoma, in the event the Court is inclined both to read its prior Preservation Order to so require, and to decline further relief in the form of a modification of its Preservation Order along the lines defendant has requested.

3. This declaration is based on my personal knowledge, as well as factual information gathered on my behalf by NARA staff.

*NARA's Role in the Management and Retention of U.S. Government Records*

4. The Archivist of the United States has the statutory responsibility to "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation" of governmental policies and transactions, as well as to ensure "proper records disposition." 44 U.S.C. § 2904. Working in cooperation with the Archivist, the head of each agency is, in turn, required to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." *Id.*, § 3102. Both the Archivist and agency heads have the responsibility "to promulgate standards, procedures and guidelines with respect to records management." *Id*, § 2904(a). By statute, the Archivist "establish[es] standards for the selective retention of records of continuing value, and assist[s] Federal agencies in applying the standards to records in their custody." *Id.*, § 2905. The statutory scheme thus contemplates that all federal records will be appraised as either having temporary or continuing value, in accordance with records schedules approved by the Archivist. Pursuant to such record

schedules, records that are designated as permanent are subject to transfer into the legal and physical custody of the National Archives under the terms of those schedules.

*Records in NARA's Legal and/or Physical Custody – A General Overview*

5. The Archivist is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) & 2110. The Archivist's statutory and regulatory scheme includes a comprehensive framework for ensuring that there are specific environmental and security requirements for the storage of records in NARA's legal custody, including stringent environmental and security standards for the storage of permanent records in our agency's archival facilities. See NARA 1571 ("Archival Storage Standards") & NARA 1572 ("Security for NARA Holdings") (attached at Tabs A & B, respectively). Additionally, pursuant to 44 U.S.C. 2107 and 2904, "[t]he Archivist of the United States has authority over the placement of permanent records." 36 C.F.R. 1228.70 Accordingly, permanent records, once placed in an archival facility, are presumptively not subject to further transfer or loan except under very narrow and controlled circumstances. *Id*

6. To house what at latest estimate is approximately 3.3 million cubic feet of archival holdings, 543,000 artifacts, and over 11.8 billion electronic logical data records, NARA currently maintains two national headquarters facilities in the Washington, DC area. NARA also is responsible for the preservation of hundreds of millions of presidential records contained within 11 presidential libraries throughout the country. A discussion of NARA's separate regional facilities holdings is contained in my colleague Gregory Pomicter's Declaration, filed contemporaneously herewith. In light of my

principal duties and responsibilities for the management of NARA's archival holdings in the Washington, DC area, I will provide a brief introduction to NARA's holdings, and then will generally limit my discussion to how plaintiff's interpretation of the current Preservation Order, and/or a failure to modify the Order along the lines defendant proposes, would affect NARA operations in processing and working with respect to archival holdings in our headquarters buildings in Washington, DC and College Park.

*NARA's Storage of Records Relevant To This Litigation*

7. NARA's vast archival holdings are organized or classified in over 500 record group designations. In general, federal records are arranged by the name of the government agency with which they are associated (*e.g.,* the Defense Department (formerly War Department), the Treasury Department, the Government Accountability Office, the Department of Interior, etc.), and each agency has its own bureaucratic filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. Rather, the records of each agency are arranged and filed by the agency's own bookkeeping and filing system, in accordance with existing file plans and records series set out in each agency's records schedules. For example, Army records might be arranged by the name of a division, fort, or department, not what tribes Army staff might have had contact with. Consequently, NARA archivists are not generally able to search records of all government agencies under the search term "Kaw Nation" to locate all records relating to this tribe. Moreover, although, as described in more detail below, most records related to the Kaw Nation would be expected to be found within the Department of Interior's (DOI) record groups, NARA archivists are also aware

of many record groups outside of DOI that also might conceivably contain Kaw Nation-related records.

8. The records of DOI collectively comprise sixteen record groups, including among others located in our headquarters archives, Record Group 75 (Records of the Bureau of Indian Affairs (BIA)), and Record Group 48 (Records of the Office of the Secretary of the Interior (OSI)). Many of these DOI Record Groups potentially hold extremely substantial quantities of archival records. For example, in our Main Archives facility in Washington DC, we estimate that there are at least 25,777 cubic feet of BIA records in Record Group 75, housed in 58,549 containers (which would stretch to over five miles of records). Based on NARA's estimate that each cubic foot of records contains, on average, between 2000 and 3000 pages, this record group alone approximately contains between 52 and 77 million pages. In turn, we estimate that we have 34,383 cubic feet (approximately between 69 and 103 million pages) just of "known" records relating to Native Americans in our archival holdings at the Archives II building in College Park. These holdings are drawn from approximately 73,978 cubic feet (approximately between 148 and 222 million pages) of records consisting of Record Group 48 (Records of the Office of the Secretary of the Interior); Record Group 57 (Records of the United States Geological Survey), Record Group 79 (Records of the U. S. Park Service); Record Group 217 (Records of the Office of the Accounting Officers of the Department of the Treasury); Record Group 381 (Records of the Office of Economic Opportunity); Record Group 411 (Records of the Government Accountability Office), and Record Group 513 (Records of the Indian Health Service), each of which may include information on the Kaw Nation tribe relevant to this lawsuit.

9. As a general matter, although NARA's collections of records in each record group more or less have existing documentation and finding aids associated with them, which normally can be of use to researchers in locating records related to the Kaw Nation tribe, NARA neither has nor generates in the ordinary course of its operations document-level indexes of its collections sufficient to identify all records relevant to the present lawsuit. Moreover, neither NARA's holdings, nor our existing finding aids, can be said to be differentiated or segregated into what constitute "trust" and "non-trust" records pertaining to either Indian affairs generally or Kaw Nation-related records specifically. Accordingly, to make available to plaintiff in Oklahoma all inactive "Kaw Nation trust records," searches would have to be devised and conducted according to ad hoc and highly variable filing systems developed over the course of the past 100 or more years by all the pertinent government agencies involved. To the extent that the Preservation Order can be read to obligate NARA archivists to first attempt to engage in isolating solely "trust" records relating to the Kaw Nation from the larger known or conceivable collections of records groups containing records relating to the Kaw Nation tribe, for the purpose of moving records to Oklahoma, such a reading of the Order amounts to imposing an impossible burden on this Agency to perform given the magnitude of performing such a task.

10. Given what might be on the order of the thousands of hours involved, *see infra,* ¶ 15, requiring highly-trained NARA archivists to devote their time to a project of isolating Kaw Nation-related records and/or Kaw Nation-related trust records would, in my view, effectively mean shutting down the ability of the significant offices of the National Archives of the United States in College Park and in Washington DC to perform

the important mission of providing reference services to the public at large. Such reference services include providing guidance to individual citizens who personally visit NARA headquarters facilities, or who write in or call us, seeking guidance as to where to locate individual records in our vast collections. In FY 06, NARA headquarters staff handled 23,373 written reference requests and 57,642 oral reference requests for information about our holdings. In addition to handling reference requests, my staff also is actively engaged in processing a backlog of more than a million cubic feet of records awaiting being made available to the public; accessioning approximately 23,650 cubic feet of new records from fiscal year 2004 to fiscal year 2008; performing preservation work on existing archival record collections; and screening records for privacy-related information and to ensure that only unclassified records are opened.

11. No less impossible is the task of reliably segregating "all" records related to the Kaw Nation tribe for inspection by plaintiff in Oklahoma, even without regard to a concern for their "trust" or "nontrust" status. Just with respect to Bureau of Indian Affairs records in Record Group 75, there is a tremendous level of complexity to NARA's records holdings, coupled with highly varying degrees of documentation ranging from the helpful to the unhelpful with respect to isolating holdings related to the Kaw Nation tribe. BIA records are most often arranged by the federal agency that had responsibility with respect to particular tribes, rather than by the name of a specific tribe. The BIA has had responsibilities regarding Indian tribes from 1824 to the present, and was set up in an organizational system of "agencies" under an "agent" that oversaw different tribes or reservations and reported back to Washington to the Commissioner of Indian Affairs. The records were filed in Washington under the name of the agency. In

the case of the Kaw Nation, records relating to the Kaw or Kansa Indian Tribe may be found under Fort Leavenworth Agency, 1823-1847, Osage River Agency, 1847-1851, Potawatomi Agency, 1851-1855, Kansas Agency, 1855-1876, and also under the larger rubric of the St. Louis Superintendency and Central Superintendency which supervised many agencies in a whole area. In the period from 1881 to 1907, the Kaw records may be under the Osage Agency and the Kaw Agency. The Kaw Agency was not established until 1904. There are no correspondence files in the 20th century that include only the Kaw or Kansa, except for the few years of the existence of the Kaw Agency, 1904-1912. In 1912, the Kaw Agency was merged with the Ponca. Kaw records stayed with the Ponca when that agency was merged with the Pawnee Agency in 1927.

12. In addition, any other potential records related to the Kaw Nation tribe within NARA's archival collections of BIA records are subsumed within a very large number of more generic categories of Indian records types, including such categories as correspondence files consisting of "Letters Received by the Office of Indian Affairs," broken down into three periods 1824 to 1880/1881, 1881 to 1907, and 1907 to 1957, respectively. There would be thousands of boxes of letters to sort through, filed by a number retrievable by an existing register. In many instances, where particular original documents do not exist amongst NARA's holdings, synopses of letters are available on a separate Register of Letters, or in a series entitled Abstracts of Letters Sent. Other series of records within Record Group 75 that might contain records relating to the Kaw Nation tribe, if examined, would include BIA correspondence files called General Services (1,666 boxes for the years 1909-1939, and 1,500 more for subsequent time periods), as well as records under the headings Surveys, Allotment Books, School Reports, Inspection

Reports, Claims, Treaty Files, Land Reserves, Military Bounty Lands, Census Records, Annuity Payment Rolls, Enrollment Records, Personnel and Employment Records, Removal Records, Irrigation Division Records, Forestry Division Records, Education Division Records, records from the office files of several commissioners, records of the Health Division, Registers of Contracts, Land Management Standards and Surveys, Farming and Grazing Leases, Land Operations Branch Annual Reports, Administrative Office Files of the Branch of Welfare, Job Corps Records, Hearings on Indian Affairs, Economic Development of Tribal Resources, and a plethora of additional categories, all of which conceivably might contain Kaw Nation-related records.

13. As extensive as NARA's BIA archival holdings are, they represent only a fraction of the universe of record collections potentially containing records relating to the Kaw Nation tribe. As listed in more detail *supra,* ¶ 8, NARA's archival collections in College Park also include Record Groups 48, 57, 79, 217, 381, 411, and 513. Some of these record groups are known to contain substantial holdings of Indian records, and may well hold information about the Kaw Nation tribe; however, although some of these record collections have isolated references to the name Kaw Nation, the majority of the records are neither indexed nor searchable under the name Kaw Nation. For such collections, a labor-intensive research effort would need to be undertaken to review individual collections on a file-by-file basis, to determine if records related to the Kaw Nation existed. This would be the case given that existing finding aids are structured to correspond to how the records were organized by the various agencies that originally generated or maintained the records, as explained above, and not necessarily by name of tribe. As stated above, *supra* ¶ 8, this substantial subset of "likely places" to find records

related to the Kaw Nation tribe itself amounts to an estimated 34,383 cubic feet of records holdings.

14. For the foregoing reasons, the task of finding all or substantially all archival records in NARA headquarters collections actually relating to the Kaw Nation is simply not possible without a close review of millions of unindexed records. NARA does not have either the adequate staffing or resources that would be needed to attempt to engage in isolating or indexing these vast records collections, for the purpose of transfer of such records (or copies of records) to Oklahoma.

15. Based on my extensive experience in reviewing archival records, including on very large projects involving thousands of individual pages, I am generally familiar with how much time it would take a NARA archivist reasonably familiar with the relevant records collections to review archival holdings for the purpose of isolating Kaw Nation-related records. I would not wish to quantify the time it would take to review box and file contents at the file- or document level. As a matter of my past experience I can attest that the review process might involve many hours of labor . To review just the 25,777 cubic feet of records at our Main Archives facility involving BIA records would take many thousands of hours of labor by NARA's staff.[1] Pulling any substantial number of staff members away from all of the other functions that NARA archivists perform, solely for the purpose of isolating and copying Kaw Nation-related records, would interfere with all of the other competing priority work performed on a daily basis by my NARA staff, including the referencing, processing, and screening functions I described at length, *supra,* at ¶ 10.

[1] Moreover, the hypothetical does not take into account the additional 34,383 cubic feet of non-BIA records in our College Park holdings likely to contain Kaw Nation-related records that I referenced above.

*NARA's Specific Objections To Plaintiff's Interpretation of the Preservation Order*

16. On NARA's behalf, I note the following specific objections to plaintiff's interpretation of the Preservation Order:

17. First, NARA's policy during the 70 years that our reading rooms have been open and available to the public has been to afford access to all to our permanent archival holdings. As such, Kaw Nation-related records that are contained in various of the above-referenced record groups are open and available for research and copying by plaintiff's counsel in this litigation, just as they are to all members of the public. NARA objects to any requirement set out in the Preservation Order that would require NARA staff to assume duties never before performed, including isolating "trust" records on behalf of a party litigant, and/or engaging in wholesale segregating out and copying of records collections solely for the convenience of one plaintiff party. As a matter of principle, this Court should not shift the burden to NARA staff to perform highly intensive research for the benefit of one party, given the fact that all other members of the public will suffer due to the diversion of staff resources that would ensue. To the extent that the Preservation Order is being read to impose an additional burden on NARA staff to provide assistance to plaintiff beyond what might be reasonably provided to a member of the public asking for reference assistance, those requirements of the Order should not be enforced and should otherwise be deemed inapplicable to NARA.

18. Second, for the reasons given above, any reading of the Preservation Order to require the imposition of an obligation on NARA staff to cull out and copy Kaw Nation-related records should not be imposed, as it would place crippling burdens on NARA and

its staff and in fact should be regarded as simply impossible to comply with, given existing time and resources.

19. Third, NARA objects in the strongest terms to any requirement to move or transfer *original* copies of archival documents to Oklahoma. Any such contemplated move would risk wholesale disruption of existing archival collections that have been stably placed in NARA's national headquarters for many decades. A long laundry list of concerns going to the security, continued integrity, and preservation of our existing collections under appropriate environmental controls would arise if the Court were to order such a transfer. Simply put, NARA's archival custodial responsibilities make any proposal for shipment of records away from archival facilities untenable. It also would be fundamentally unfair to other researchers to be creating large holes in existing collections, solely for the convenience of one plaintiff party.

20. In lieu of plaintiff's interpretation of the Preservation Order being made applicable to NARA archival collections, I can represent on behalf of NARA's headquarters staff, that NARA very much wishes to assist plaintiff in providing existing finding aids that deal primarily with records related to the Kaw Nation and other Indian tribes, so as to work with plaintiff and its representatives in an effort to find and review as many Kaw Nation-related trust records as possible. We have senior and knowledgeable archivists regarding the records of Indian country, and based on our institutional knowledge of our archival holdings (including using existing finding aids effectively), we stand willing to work with plaintiff on a voluntary basis in assisting plaintiff's own efforts to find publicly available, pertinent material during the discovery phase of the present lawsuit.

21. In sum, plaintiff's preferred reading of the Preservation Order would cripple NARA's ability to perform its important mission to U.S. citizens, by hugely diverting scarce staff resources for a collection, copying and transfer of records enterprise of vast dimension, but uncertain utility and result, in any reasonable time frame. Any such interpretation of the standing Preservation Order would also impose unprecedented burdens on this Agency to the extent it requires the expenditure of resources towards the isolation or segregation of particular types of records otherwise fully open and available to the public, merely on behalf of a party seeking records in furtherance of litigation. On behalf of this agency, I urge the Court not to read into the existing Preservation Order any such requirement for the transfer of records, or any other requirement that would impose such severe burdens on NARA and its staff, and severely constrain NARA's ability to serve the public at large, including those who seek research assistance and access to NARA holdings.

I declare under penalty of perjury that the foregoing is true and correct.

Steven D. Tilley

STEVEN D. TILLEY

Executed on this 17th day of January 2008

# TAB A
# TO
# EXHIBIT 3

# National Archives and Records Administration

**NARA 1571**
February 15, 2002

**SUBJECT:** Archival Storage Standards

**1571.1 What is the purpose of this directive?**
This directive establishes structural, environmental control, fire safety, preservation, and security standards for appropriate archival storage conditions in NARA archival facilities.

**1571.2 What is the authority for this directive?**
The authorities for this directive are

a. 44 U.S.C. 2109, which makes the Archivist of the United States responsible for the preservation of records or other documentary material transferred to the Archivist's legal custody. Appropriate storage conditions are an essential component of a strategy for preservation of archival records.

b. 44 U.S.C. 2112 and 2903, which make the Archivist responsible for custody, control and operation of certain buildings, land, and space.

c. 44 U.S.C. 2112(a)(2), which requires the Archivist to promulgate architectural and design standards for new and existing Presidential libraries.

**1571.3 Definitions**
For purposes of this directive, the following definitions apply

a. **Archival facility** means

(1) A NARA-owned or leased facility used to store archival records;

(2) A GSA-owned or leased facility used by NARA to store archival records; or

(3) A Presidential library acquired by agreement in accordance with 44 U.S.C. 2112(a)(1)(B)(i).

b. **Archival records** means

(1) Federal records, Presidential historical materials, Presidential records, and donated historical materials transferred to the legal custody of NARA; and

(2) Supreme Court records and the records of Congress that have been deposited in NARA's physical custody.

c. **Facility manager** means the program official who is responsible for facility management activities within that building.

d. **Records area** means a records storage area, a designated processing area, an exhibit area, or a preservation (conservation, duplication, microfilm, digital imaging) laboratory. The term covers areas where records may be kept for extended periods.

e. **Records storage area** means an area containing archival records that is enclosed by four firewalls, the floor, and the ceiling. The term includes general stack areas, vaults, and storage areas for exhibits and museum objects, but does not include reference space, staff offices, public spaces (e.g., restrooms and lobbies) or processing areas.

f. **Research room** means a room in which researchers may use original records and for which they must be issued a researcher identification card.

## 1571.4 Responsibilities

a. **Space and Security Management Division** (NAS)

(1) Conducts periodic building condition surveys as outlined in par. 1571.23 and assists the program offices in establishing and maintaining a system-wide facility improvement and renovation program;

(2) In coordination with other NARA offices, establishes architectural and design standards for all leased and NARA-owned facilities;

(3) Furnishes professional and technical advice on the design and construction of archival storage facilities; and

(4) Acts as project manager for archival facility design and construction projects.

b. **Preservation Programs** (NWT) conducts an integrated, scientific preservation program, including

(1) Developing and recommending long-range preservation plans and policy for archival records, coordinating with the Office of Presidential Libraries (NL) and the Office of Regional Records Services (NR), as necessary;

(2) Writing specifications for and providing quality assurance testing of those materials used to prolong the useful life of records (e.g., folders and boxes) and of materials that will be used in the proximity of records (e.g. paint, adhesives and finishes, carpeting, pesticides, and cleaning supplies);

(3) Monitoring environmental conditions of archival facilities;

(4) Administering integrated pest management programs;

(5) Providing technical advice and consultant services on specialized storage requirements to NL, NR, and the Office of Records Services – Washington, DC (NW);

(6) Furnishing professional and technical preservation assistance; and

(7) Reviewing the design and construction of archival storage facilities for records preservation issues.

c. **Presidential library directors** administer the day-to-day facilities management program of the library in coordination with the NL, and major renovation and restoration projects in coordination with NL and the Office of Administrative Services (NA).

d. **Regional administrators and facility directors** administer the day-to-day facility management programs of the regions in coordination with NR.

e. **Facilities and Materiel Management Services Division (NAF)** is responsible for the day-to-day facility management program of the National Archives Building and the National Archives at College Park (Archives II).

**1571.5 To what NARA archival facilities does this policy apply?**

a. This policy applies to all new NARA archival facilities occupied by NARA on or after October 1, 2001, except new space leased for archival programs on a short-term basis while a permanent archival facility is being built or renovated. Additional facility specifications that are not directly related to appropriate storage conditions for archival records may be included in supplements to this directive.

b. New space leased on a short-term basis must meet the facility standards for storage of permanent Federal records specified in 36 CFR Part 1228, Subpart K.

c. To the extent feasible and financially practicable, existing NARA archival facilities should conform to these standards when the facility is renovated or otherwise significantly modified. If the facility cannot be brought into conformance with every standard, NA and the affected program office determine what mitigating action will be taken to minimize threats to the holdings. For example, if piping within a storage area cannot be removed, a mitigating action, such as frequent inspections, may be identified. Mitigating actions must be coordinated with NWT and approved by the Archivist.

d. All NARA archival facilities must have an Integrated Pest Management program (see par. 1571.17) and must enforce the facility policies specified in par. 1571.24.

e. All NARA archival facilities must comply with pars. 1571.14 and 1571.15 when selecting and installing new furnishings and materials, including carpet, in the facility and par.

1571.12 when painting records storage areas.

**1571.6 What are the general structural standards for NARA archival facilities?**

a. The facility must be designed in accordance with regional building codes to provide protection from building collapse or failure of essential equipment from earthquake hazards, tornadoes, hurricanes, and other potential natural disasters.

b. The facility must be constructed with non-combustible materials and building elements, including roofs, walls, columns, and floors.

c. A floor load limit must be established for the records storage area by a licensed structural engineer. The limit must take into consideration the weight of the specific type(s) of archival records to be stored, height and type of the shelving or storage equipment, the width of the aisles, the configuration of the space, etc. The allowable load limit must be posted in a conspicuous place and must not be exceeded.

d. The architectural and engineering design team for the facility must include and work closely with a preservation specialist, who has experience in developing archival storage facilities and has been approved by NARA. The plans for the facility must be reviewed by NWT at each submission stage.

**1571.7 What standards must be followed to protect against water damage?**

a. **Location of facility.** The archival facility must be sited a minimum of five feet above and 100 feet from any 100 year flood plain area, or be protected by an appropriate flood wall that conforms to local or regional building codes.

b. **Roof.** The facility must ensure that the roof membrane does not permit water to penetrate the roof. Place nothing on the roof that may cause damage to the roof membrane, including equipment. Do not install skylights or sloped glazed windows in areas where records are regularly present. Avoid roof penetrations, including vents, over these areas. However, automatic roof vents, designed solely to vent in the case of a fire, with a temperature rating at least twice that of the sprinkler heads, may be used over records storage areas.

c. **Piping.**

(1) Do not run piping (except fire protection sprinkler piping and storm water roof drainage piping) through records storage areas.

(2) If drainage piping from roof drains must be run though records storage areas, the piping must be run to the nearest vertical riser and must include a continuous seamless gutter sized and installed beneath the lateral runs to prevent leakage into the storage area. Vertical pipe risers in records storage areas must be fully enclosed by shaft construction with appropriate maintenance access panels.

d. **Location of records within the facility.**

(1) Do not store records below grade. Cave/underground facilities may be exempted from the requirement to store records above ground if the facilities

(a) Meet the other standards in this directive;

(b) Demonstrate long-term low risk to records because of water, fire, or structural threats; and

(c) Are granted a waiver from a specific standard by the Archivist.

(2) Store records at least 3 inches from the floor surface.

(3) NWT and NAS must review plans to place records shelving equipment along an exterior wall in advance.

(4) No fountains, pools, or standing water are allowed over or adjacent to areas where records are stored, processed, used, or exhibited.

e. **Water detection system.** If special considerations indicate concerns with possible water damage in records storage areas, consult with NWT on the advisability of installing a water detection system.

**1571.8 What are the general heating, ventilation, and air conditioning (HVAC) requirements?**

a. Archives storage areas, processing areas, and preservation laboratories must be served from separate HVAC systems. All other areas of the building may share the same HVAC system. HVAC equipment must not be mounted on the roof of a new facility.

b. Air handling units serving records storage and processing areas must provide sufficient air exchanges to maintain requirements for temperature, relative humidity, and pollutant control. The number of air exchanges are determined by the planned size of the room, volume of records, volatile organic compounds coming off the records, occupancy, etc.

c. The records storage areas of the facility must be kept under positive air pressure especially in the areas adjacent to the loading dock. Loading docks must have an air supply and exhaust system that is separate from the remainder of the facility.

d. Areas where records are used, processed, stored, or exhibited must be isolated from sources of pollutants and particulates, such as the loading dock, machine rooms, or areas where woodworking or painting take place. Doors to the record areas must not open directly onto the loading dock, machine rooms, locations where woodworking or painting takes place, or other similar areas. The air intakes and returns must be designed such that lower quality air and environment cannot affect the records areas, and must have direct venting to the outdoors.

**1571.9 What are the temperature and humidity standards?**

a. Appendix A specifies the **maximum** acceptable temperatures in areas where records are stored, and the **maximum** acceptable temperature set point for areas where records are exhibited, processed, or used. Appendix A also specifies the acceptable range for relative humidity in areas where records are stored, processed, exhibited, or used. Use cooler temperature and drier relative humidity set points whenever possible, as these conditions extend the life and significantly enhance the preservation of the records. Coordinate the selection of temperature and relative humidity set points with NWT.

b. The standards specified in Appendix A must be maintained 24 hours per day, 365 days per year, unless otherwise stated. Once a set point is programmed, daily fluctuations must not exceed 5° F and/or 5 percent relative humidity. Relative humidity levels represented in a range indicate minimum and maximum set points. Seasonal movement between these set points must not exceed 5% per month while staying within the +/-5% daily band restriction.

c. Seasonal relative humidity drift in actual operation of the system to reconcile energy efficiency and external climate extremes in certain geographical locations and with certain building types may occur. The building should be designed to accommodate the environmental requirements in a highly energy efficient manner.

d. Temperature and relative humidity conditions in records areas must be continuously monitored and must be recorded at intervals that are frequent enough, and in a sufficient number of locations to demonstrate and confirm compliance with the standard. The facility manager must maintain the HVAC systems and integrated monitoring equipment according to manufacturer's specifications. The facility manager is responsible for monitoring the temperature and relative humidity conditions in the facility following NWT guidance and specifications, and ameliorating problems as they develop. Report ongoing problems to NWT and NAS.

**1571.10 What are the limits for air pollutants (particulate and gases)?**
Appendix B specifies the maximum allowed levels of particulates and gases in records storage areas, processing areas, exhibit areas, and research rooms. The facility manager is responsible for monitoring for pollutants in the facility at intervals frequent enough to demonstrate and confirm compliance with the standard, following NWT guidance and specifications. The facility manager is responsible for maintaining particulate and gas filtration systems according to manufacturer's specifications and ameliorating problems as they develop. Report ongoing problems to NWT and NAS.

**1571.11 What air handling and filtration systems are required?**
The following filtration systems are required in the air handling unit for the records storage and processing areas:

a. **Gas-phase filtration system.** The gas phase filtration system must control

effectively gas phase contaminants including, aromatic, aliphatic, oxygenated hydrocarbons, chlorinated hydrocarbons, and inorganic acid/basic compounds. The operation of the air purification system may be a combination of chemisorption, adsorption, and catalytic processes. The system must be designed to allow periodic monitoring of the filter performance by providing sampling ports or access to the filter ports.

b. **Particulate filtration system.** The particulate filtration system for archival records storage and processing areas must have a Minimum Efficiency Reporting Rating (MERV) of 14 or greater based on ASHRAE 52.2, "Methods of Testing General Ventilation Air Cleaning Devices for Removal Efficiency by Particle Size." To extend the service life of the system, it may be desirable to install preliminary filters with lower MERV ratings. A pressure drop measurement system or other equipment must be provided to determine when the filters need to be changed

c. **Humidification control system.** The air handling units must be designed for both humidification and dehumidification. Humidification must be achieved by a clean steam injection system (such as an electronic steam humidifier), an atomized air system using clean water, or equivalent system located down stream of the gas filtration system. The design of the system must ensure that the system does not generate or harbor microorganisms.

**1571.12 What finishes are permitted in records areas?**

a. Use a water-based latex paint for painting walls and ceilings. All concrete block walls in the storage area must be primed and painted to prevent dust.

b. Use a low volatile organic compound (VOC) acrylic membrane curing compound for the concrete floors of the records storage areas, after which apply a floor epoxy. Limit the VOC off-gassing of any epoxy and floor coatings in any area where records are processed, used, stored, or exhibited to less than 0.1 part per million by restricting the use of toluene and xylene in the floor coating mix.

c. Use a powder-coating system to paint all painted metal shelving surfaces (including map cases, museum cabinets, etc.) used within all records areas. The powder-coating polymer must be a polyester epoxy hybrid or best equivalent available that passes NWT-conducted or independent lab tests for hardness, coating stability, bending, coating adhesion, and coating durability. The paint must not exceed the off-gassing limits specified in Appendix B. Do not apply powder coating to the metal surfaces onsite in the storage area.

d. If ceiling pipe or exterior stack wall metal panels are to be painted, use an acrylic water reducible primer covered by two latex paint coats.

**1571.13 What finishing materials are prohibited in areas where records are used or stored?**

The following materials are not permitted in the areas where records are used, processed, exhibited and stored, including vaults, but may be used in other areas of the facility. For renovated facilities, this paragraph does not apply to previously installed or applied materials.

a. Cellulose nitrate lacquers and adhesives;

b. Polyurethane products, including paints, varnishes, and foams;

c. Acid-curing silicone sealants and adhesives;

d. Sulfur containing materials that could release $SO_2$;

e. Pressure sensitive adhesives that release VOCs;

f. Unstable chlorine polymers (PVCs);

g. Formaldehyde emitting compounds, such as might be found in particle boards;

h. Vinyls; and

i. Oil-based paints and varnishes.

**1571.14 What materials may be used in records storage areas and records areas, and how is their suitability determined?**

a. Finishing materials, such as paints, finishes, fabrics, carpeting, and floor and wall coverings, used in areas where records are processed, stored, or exhibited for any purpose, must be approved by NWT. NWT may need to test or direct the testing of materials to determine suitability and render approval. Sufficient time to undertake testing must be incorporated into planning and construction schedules.

b. Cleaning supplies used in areas where records are regularly present should be selected carefully to minimize potential damage to records. NWT will provide more specific guidance on how to select appropriate products, and types of products or specific products whose use is restricted or prohibited.

**1571.15 Are carpeting and wall coverings permitted?**
Carpeting, vinyl tiles, and wall coverings are not permitted in the records storage areas, but may be used in other parts of the archival facility. Carpeting, vinyl tiles and wall coverings that minimize off gassing of VOCs must be used in areas where records are regularly present.

**1571.16 What are the requirements for lighting?**

a. **Records storage areas.**

(1) Normal light levels must not exceed 500 Lux measured 36 inches above the floor level. Ultraviolet (UV) filtration on emergency lighting is required so that UV radiation below 400 nanometers in wavelength does not exceed 75μ W/lumen and 75 μW per square meter

of surface area.

(2) Where records are not protected by an enclosure:

(a) UV filtration as specified in subpar. a(1) is required on all lights.

(b) Lights in the storage areas that are not required for safety must be off when work is not taking place. Systems (e.g. motion detectors, timers, etc.) should be incorporated to ensure that light exposure to the holdings is minimized.

b. **Processing areas.** Lighting levels for normal office space may be used. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

c. **Exhibit areas.** Lighting must have the capability of full control for light levels 0-200 lux. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

d. **Research rooms.** Lighting levels for normal office space may be used. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

**1571.17 What are the requirements for pest and vermin control?**

The archival facility must have an Integrated Pest Management (IPM) program as defined in the Food Protection Act of 1996 (Section 303, Public Law 104-170, 110 Stat. 1512). The facility manager is responsible for monitoring and amelioration of problems as they develop. Report problems to NWT.

**1571.18 What are the general fire-safety requirements for archival facilities?**

a. NARA archival facilities must comply with requirements and recommended practices specified in NFPA 232-2000, Standard for the Protection of Records unless a requirement in this directive is more stringent.

b. Do not install mechanical equipment containing motors rated in excess of 1 HP within records storage areas.

c. Do not install high-voltage electrical distribution equipment (i.e., 13.2kv or higher switchgear and transformers) within records storage areas.

d. Penetrations in the walls must not reduce the specified fire resistance ratings.

e. Provide a redundant source of primary electric service, such as a second primary service or an appropriately rated emergency generator to ensure continuous, dependable service to the fire alarm and fire protection systems. Manual switching between sources of service is

acceptable.

f. Do not store hazardous materials, including records on cellulose nitrate film, in records storage areas. Records on cellulose nitrate film may include still photographic negatives, still photographic transparencies, x-rays, motion picture film and microfilm. Nitrate motion picture film and nitrate sheet film may be stored in separate areas that meet the requirements of the appropriate NFPA standard, NFPA 40 (1997), Standard for the Storage and Handling of Cellulose Nitrate Motion Picture Film, or NFPA 42 (1997), Code for the Storage of Pyroxylin Plastic.

**1571.19 What are the smoke detection system requirements?**

a. The archival facility must have an approved, supervised automatic smoke detection system providing full-building coverage. Smoke detection systems must meet the requirements of NFPA 72, National Fire Alarm Code, and must be maintained in accordance with NFPA 72, Part H.

b. Locate smoke detection devices to provide a 99 percent reliability of detecting the origin of the fire in less than 5 minutes. Use photoelectric-type detectors in records storage areas.

**1571.20 What are the requirements for automatic sprinklers?**

a. All records storage and adjacent areas must be protected by a professionally designed automatic sprinkler system that is designed to limit the maximum anticipated loss from any single fire event to a maximum of 300 cubic feet of records destroyed. Sprinkler systems for records storage areas must be separately zoned from other building areas.

b. A wet sprinkler system, installed in accordance with NFPA 13, Standard for the Installation of Sprinkler Systems, must be used except as provided in subpar. c.

c. Clean agent systems that comply with NFPA 2001, Standard on Clean Agent Fire Extinguishing Systems, or pre-action sprinkler systems must be used in cold-storage rooms and other areas subject to temperatures below 40°F, and may be used in records storage vaults and museum storage areas. These systems also may be used in computer rooms and electrical and telephone closets.

**1571.21 What are the security requirements for archival facilities?**

a. The facility must comply, at a minimum, with the security specifications for a Level III facility as defined in the Department of Justice, U. S. Marshals Service report Vulnerability Assessment of Federal Facilities dated June 28, 1995. A copy of the specifications is provided in Appendix A to 36 CFR Part 1228. NAS designates facilities that require higher level security specifications.

b. The facility must have an anti-intrusion alarm system to protect against unauthorized entry.

c. The facility must enforce controls on access to records storage areas.

d. Special security measures may be required for records storage vaults to comply with information security requirements or to protect materials of high intrinsic or monetary value.

**1571.22 How should the building condition be monitored and maintained?**
The facility manager must ensure that

a. Schedules are developed for maintenance and calibration of control system devices for all major building systems in accordance with manufacturers' recommendations;

b. Scheduled maintenance is performed promptly; and

c. Schedules are reviewed and updated annually.

**1571.23 How often should building condition surveys be conducted?**
To ensure that archival facilities subject to this directive meet the standards, NAS should conduct (or contract for) building condition surveys according to the following schedule:

a. **New facilities.** Once before acceptance of a new archival facility, at two years, and again when 10 years old. After 10 years, follow the schedule for existing facilities. If any "punch-list" items are identified in the inspection before acceptance, NAS must monitor correction/completion of those items.

b. **Existing facilities.** Every 5 years. When an existing facility is renovated or significantly modified, the 5-year cycle begins again in the fiscal year following completion of the renovations or modifications. A pre-acceptance inspection is performed for building renovations. If any "punch-list" items are identified in the inspection before acceptance, NAS must monitor correction/completion of those items.

**1571.24 What other facility use policies contribute to appropriate archival storage conditions?**

a. Prohibit smoking, eating, and drinking in all areas in which records are stored, exhibited, or used.

b. In facilities that have records processing areas, prohibit processing records and photocopying in the records storage areas. To ensure that records are subjected to the best environmental conditions available, retain them in processing areas for as short a time as possible.

## Appendix A
## Temperature and Relative Humidity Standards for Archival Records

**Table 1. Records Storage Areas**

| **Records medium** | **Dry Bulb Maximum Temperature** | **Relative Humidity Set Point** |
|---|---|---|
| **Paper**<br>Textual records including files, cards, bound volumes, computer printout and other papers<br>Cartographic records including maps, charts, architectural drawings, posters | 65°F* | 35 - 45%* ± 5% |
| **Photographic media (black and white)**<br>Black and white non-acetate/non-nitrate motion and still picture negatives/ film, photographic paper prints, x-rays, and microforms | 65°F* | 35% ± 5% |
| **Photographic media (black and white)**<br>Black and white acetate motion and still picture negatives/film, x-rays, and microforms; diazo and vesicular microfilm (not including reference copies) | 35°F | 35% ± 5% |
| **Photographic media (color)**<br>Color still and motion picture negatives/ film, slides, and prints<br>Modern digitally produced prints (ink jet, dye sublimation, electrophotographic, and thermal) | 35°F* | 35%± 5% |
| **Transition/barrier room** at "cold" storage stack | 50°F | 35%± 5% |
| **Magnetic/electronic media** including computer tapes and disks, video tapes, audio tapes, optical disks | 65°F* | 35%± 5% |
| **Other**<br>Artifacts and Presidential library gifts | 65°F | 35 - 45%± 5% |

**Note to Table 1**: Specific microclimates (cases, sealed frames, special housings) may be required for some materials on exhibit and in storage. Materials may include: parchment, photos, fragile bound volumes, metals, or textiles. Items loaned from other institutions may require tighter RH control as per loan agreements

*Cooler temperature set points and within the specified range drier relative humidity set points should be used for these media whenever possible in order to improve the preservation of the records. Magnetic/electronic media should not be stored at a temperature lower than 46°F.

**Table 2. Other Areas/Rooms**

| Space used for: | Maximum Dry Bulb Temperature Set Point* | Relative Humidity Set Point* |
|---|---|---|
| Processing areas/rooms | 70°F ± 5° | 35-45% ± 5% |
| Exhibit areas/rooms (see Appendix A, Note 1) | 70°F ± 5° | 35-50% ± 5% |
| Research rooms | 70°F ± 5° | 35-50% ± 5% |

*Cooler temperature set points and, within the specified range, drier relative humidity set points should be used for these media whenever possible in order to improve the preservation of the records. Magnetic/electronic media should not be stored at a temperature lower than 46°F.

**Appendix B**
**Air Pollutant Limits**

Following are the limits for pollutant gases in records storage, processing, and exhibit areas. The levels of pollutant gases specified in this appendix are based on the lowest concentrations that can readily be measured and achieved with current air filtration technology. There are no known "safe" lower limits below which pollutants will not cause damage.

| **Type of pollutant** | **Maximum permitted after air filtration** |
|---|---|
| Sulfur dioxide | 1 ppb (part per billion); 2.7 $\mu g/m^3$. |
| Nitrogen dioxide | 2.6 ppb; 5.0 $\mu g/m^3$ |
| Ozone | 2.0 ppb; 4.0 $\mu g/m^3$. |
| Formaldehyde | 4.0 ppb; 5.0 $\mu g/m^3$. |
| Acetic acid | 4.0 ppb; 10.0 $\mu g/m^3$ |

Note: Research rooms must have at least office quality air filtration.

# TAB B
# TO
# EXHIBIT 3

# National Archives and Records Administration

**NARA 1572**
January 14, 2006

**SUBJECT:** Security for NARA Holdings

**1572.1 What is the purpose of this directive?**
This directive specifies NARA's policy on security for NARA holdings, especially archival materials needing special protection, and the procedures for implementing the policy.

**1572.2 What are the authorities for this directive?**
18 U.S.C. 2071, 44 U.S.C. 2107, 44 U.S.C. 2111, 44 U.S.C. 2111note, 44 U.S.C. 2112, 44 U.S.C. 2118, 44 U.S.C. 2202, 44 U.S.C. 2207, 44 U.S.C. 2905(a), and 44 U.S.C. 3106.

**1572.3 What NARA holdings are covered by this directive?**

a. This directive covers Federal records, Presidential and Vice Presidential records, Nixon Presidential historical materials, and donated historical materials, including artifacts, in the National Archives of the United States regardless of their location. This directive also covers records of the U.S. Senate, U.S. House of Representatives, Architect of the Capitol, and the U.S. Supreme Court that NARA maintains and preserves.

b. This directive does not apply to classified national security information. Other NARA policy directives and guidance apply to the access and handling of classified national security information, records of concern, or the handling of incumbent Presidential gifts. These include: Interim Guidance 202-1, NARA Information Security Program; Interim Guidance 1600-3, Access to Archival Materials in the Context of Concern about Terrorism; Interim Guidance 1600-5, Access to Materials Containing Classified Information in NARA Research Rooms by Non-Governmental Persons; Life Cycle Controls for Presidential Artifacts; and our regulations at 36 CFR part 1275.

**1572.4 Responsibilities**

a. All staff working with NARA holdings are responsible for properly securing them during storage and use.

(1) Staff must report the compromise of holdings storage areas or the discovery of theft, damaged, missing, or vandalized holdings to their immediate supervisor.

(2) The supervisor determines, generally within 24 hours, whether to further report compromise of storage space, theft, damage, or vandalism to the division and office level in the Washington, DC, area, or their equivalents in the regional archives and Presidential libraries. Before reporting further, supervisors must try to determine the following:

(a) Have the materials been misfiled when placing them back in the stack after use?

(b) Are the materials being used in a research room, awaiting reproduction in a copying area, on exhibition, undergoing conservation treatment, or in an office area to show to a special visitor or group?

(c) Could the materials have been placed in a parallel file by mistake?

(d) In the case of physical damage to materials, was vandalism involved? Or did an accident occur on the part of staff, researchers, or other users?

(3) Managers must report suspected theft or vandalism to the Office of Inspector General (OIG) as indicated in NARA 1202, Office of the Inspector General - Investigations.

b. The Office of Presidential Libraries (NL), Office of Regional Records Services (NR), and Office of Records Services--Washington, DC (NW):

(1) Develop and implement standard operating procedures for each records storage area where materials requiring special protection are kept.

(2) Nominate selected staff for background checks required to access vaults or other specially protected areas and train the staff in the handling and storage of materials under special protection.

(3) Ensure that research rooms are staffed with personnel who have been trained to enforce NARA's holdings use regulations in 36 CFR 1254, Using Archival Records and Donated Historical Materials.

(4) Notify on site security personnel and the Security Management Branch (NASS) security staff of the possible theft.

(5) Notify the OIG immediately of any reports relating to suspected theft or vandalism.

(6) Provide background information about the holdings to OIG or other investigatory body on request, in accordance with all governing statutory authorities.

(7) Take appropriate disciplinary action in the cases where staff have compromised or damaged holdings.

c. The Space and Security Management Division (NAS) manages physical security and background checks through the personnel security officer in the Security Management Branch (NASS).

d. In the Washington, DC, area:

(1) Access Programs (NWC) manages NW custodial control of textual stack areas, including stack space management, with the exception of those for the Center for Legislative Archives (NWL). NWL manages its own stack areas in The National Archives Building (Archives I). The Special Media Archives Services Division (NWCS) provides that function for the stack areas storing primarily special media archives. The Electronic and Special Media Records Services Division (NWME) oversees control of electronic media storage areas.

(2) The Nixon Presidential Materials Staff (NLNS) manages the custodial control of all Nixon Presidential Historical Materials including textual, audiovisual, and specially compartmented information facility (SCIF) areas in the National Archives at College Park (Archives II). The Presidential Materials Staff (NLMS) manages textual, audiovisual, electronic artifact, and SCIF areas in NLMS control in Archives I.

e. Presidential library and staff directors (NL) and regional archives directors (NR) oversee management of archival storage space at their facilities. For holdings that require special protection beyond the facility's capacity, the director consults with the office head and NAS for assistance.

f. NR and NW as appropriate also ensure that NARA's affiliated archives comply with this directive.

## PART 1. GENERAL HOLDINGS PROTECTION REQUIREMENTS

### 1572.5 What are the minimum requirements for securing holdings when they are not in use?

At a minimum, holdings not in use must be stored in stack or storage areas with accessibility limited to authorized personnel. Managers of custodial units maintain location registers that specify the storage location of holdings at an appropriate level of physical control.

### 1572.6 What are the minimum requirements for securing classified holdings when not in use?

The additional requirements for securing holdings that contain classified national security information are described in Interim Guidance 202-1, NARA Information Security Program.

### 1572.7 What are the minimum requirements for controlling holdings when they are removed from secure storage locations?

Whenever holdings are removed from secure storage locations for any reason, staff must document the removal by completing a Reference Service Slip (NA Form 14001), a Request for Military Records (NA Form 14027), a NARA out-card, or some other NARA-approved, appropriate record of the removal that identifies the removed holdings, the staff member responsible for the removal, the reason for the removal, and the date of the removal. Requirements for materials needing special protection are in Part 2 of this directive.

### 1572.8 What are the minimum requirements for securing holdings when they are in use by persons other than NARA staff?

a. Before using any original holdings, researchers must apply to conduct research as

indicated in Interim Guidance 1600-4, Research Application Procedures. Some exceptions may be made for non-NARA users who are accessing holdings for ongoing government business or the representatives of a former or incumbent President, but such researchers must fulfill other governing statutory or regulatory requirements.

b. A NARA staff member must be present to oversee any use of holdings by persons other than NARA staff. Staff must document use of holdings by persons other than NARA staff by completing those portions of the NA Form 14001, NA Form 14027, or some other NARA-approved, appropriate record of the removal with the name of the non-NARA user and the date and times of use. Managers are responsible for communicating to users all rules for safe handling of holdings.

c. Requirements applicable to the use of holdings that contain national security information are described in Interim Guidance 202-1.

d. If NARA research room staff see a researcher damaging holdings or suspect that a researcher is attempting to steal or has stolen holdings, notify any available security officers immediately and a supervisor and the OIG as soon as possible. Do not confront the suspect. The custodial unit must keep the OIG apprised of any records determined to be missing.

e. NARA's holdings protection requirements for other institutions that borrow NARA holdings are found in NARA 1701, Loans of Holdings in NARA's Physical and Legal Custody.

## PART 2. SPECIAL PROTECTION REQUIREMENTS

### 1572.9 Is it ever necessary to take protective measures beyond the general holdings protection requirements?

Managers of custodial units may determine that some holdings need special protection requiring extra measures of physical and intellectual control.

### 1572.10 Who determines what non-classified holdings need special protection?

Managers of custodial units are responsible for making the final determinations about which holdings in their custody require special protection based on the recommendations of knowledgable archivists on their staffs.

### 1572.11 What are the characteristics of holdings needing special protection?

a. To decide whether holdings would benefit from special protection, knowledgable archival staff generally consider whether the holdings are:

(1) Especially vulnerable to theft;

(2) In extremely fragile condition; or

(3) Likely targets of vandalism.

b. Some examples of holdings that have been determined to need special protection are: some museum items in Presidential libraries; and, the patent for the electric light bulb, George Washington's account book as Commander in Chief of the Continental Army, and the rough order log and night order book of the USS Missouri among the holdings of NW.

**1572.12 How do we store and handle holdings needing special protection?**

a. The methods of storing holdings needing special protection vary with the nature of the facility and the clearance levels of the staff. The methods include the use of separate stacks or vaults.

b. Custodial offices report their storage methods and exact containers locations to NAS to compile and maintain a central list of all specially protected storage areas and containers.

c. When feasible, substitute copies of specially protected materials for original holdings for research and exhibit purposes. When this is being done, replace:

(1) Original textual materials on the shelf with a copy of the document. Copy or describe the material(s) with its unique control number if one has been assigned on archival bond paper with an annotation to the location of the original. The archival copy becomes a permanent part of the file to reduce the handling of the original and serves as a cross-reference to the location of the original item.

(2) Artifacts on the shelf with a description of the artifact.

(3) Nontextual materials with a reference copy when possible.

d. Create and maintain an item list of documents and artifacts needing special protection and keep the list in a locked security container. Keep a duplicate copy of the list under lock elsewhere in the responsible unit. Electronic copies of such lists maintained on a shared network drive must be password-protected and accessible only to staff responsible for specially protected holdings areas. If an entire series or collection needs special protection, managers of custodial units may substitute a container or folder list in place of an item list.

e. Limit access to areas containing materials requiring special protection to authorized individuals.

**1572.13 What physical controls are imposed on specially protected materials areas?**

a. Physical controls may vary depending on the building where the holdings are located. Facilities without electronic key systems must use combination locks or other secure methods of barring access to unauthorized staff and visitors. Direct questions about appropriate mechanisms and requirements to NASS.

b. Each specially protected stack, vault, or safe is equipped, at a minimum, with a three-position combination lock. Units that now use stacks or safes with keys for holdings needing special protection will plan to upgrade to stacks or safes with combination locks.

c. To change the combination, the responsible manager designates a staff member with access to the area to notify NASS and request any necessary assistance in making the change. Combinations are changed for the following reasons:

(1) First use of a newly procured combination lock;

(2) A combination lock is taken out of service;

(3) A staff member who knows the combination leaves the unit or no longer needs to know the combination; or

(4) The security of the combination appears to have been compromised.

d. The person changing the combination for a vault in Archives I or Archives II enters the combination on a Standard Form (SF) 700, Security Container Information, and forwards two copies in a sealed envelope to NAS located in Archives I and Archives II. Each copy of the SF 700 must be marked "Unclassified - specially protected material." The person also informs their supervisor and the other designated staff members with access to the area of the new combination. When the combination is changed, the manager responsible for the area documents the date of change and the reason(s) for the change in a memo sent to NAS with a copy to the office head. At locations out of the Washington, DC, area, place the SF 700 in a sealed envelope in a container with a combination lock.

e. NASS conducts inspections of secure areas as part of the cycle of security and workplace inspections.

**1572.14 How does NW conduct systematic inspections?**

a. Responsible managers inspect materials in their designated specially protected areas (see par. 1572.11) at least once a year between October 1 and April 30. (More frequent inspections are encouraged.)

b. Separate teams inspect each specially protected stack, vault, and safe. The teams consist of at least two persons and must include at least one representative of the unit responsible for the stack or safe and, if possible, a disinterested staff member who does not work directly for the individual responsible for the area being inspected. The team members work together (never alone) and do not need to know the combination for entry into the stack or safe. The appropriate NW program director appoints team members in the Washington, DC, area.

c. The inspection teams prepare written reports and submit them to the office head by May 30 with an information copy for the manager responsible for the stack or safe.

d. At least 25 percent of artifacts and unique record items that are not parts of larger series are inspected on a rotating basis.

e. In NW, for entire series under special protection, the inspectors must inspect five percent of the documents, randomly selected, in each series. The documents are compared to microfilm or published copies, special lists, indexes, or other forms of control used for the series. The responsible manager prepares a list of the items inspected and retains the list under lock for 15 years.

f. The inspectors verify that a document or artifact is located in the specially protected stack, vault, or safe, and note its physical condition. The inspectors must notify the manager of any changes in condition compared to previous inspection reports.

**1572.15 How does NR conduct systematic inspections?**

a. Responsible managers inspect materials in their designated specially protected areas (see par. 1572.11) at least once a year between October 1 and April 30. (More frequent inspections are encouraged.) Regional archives directors may defer inspections with advance approval from the office head.

b. Teams inspect each specially protected stack, vault, and safe. The teams consist of at least two persons whenever possible as a best practice. The team members do not need to know the combination for entry into the stack or safe. Regional archives directors appoint team members in NR.

c. The inspection teams prepare written reports and submit them to the office head by May 30 with an information copy for the manager responsible for the stack or safe.

d. At least 25 percent of artifacts and unique record items that are not parts of larger series are inspected on a rotating basis.

e. The inspectors verify that a document or artifact is located in the specially protected stack, vault, or safe, and note its physical condition. The inspectors must notify the manager of any changes in condition compared to previous inspection reports.

**1572.16 How do the Presidential libraries conduct inspections?**
Presidential libraries contain an extremely high volume of materials having direct association with a former president. The materials have a limited exposure to researchers and staff compared to Washington, DC, area holdings. Inspections in the libraries are conducted for the museum components. The library directors appoint the inspection teams. Each team will consist of at least two people.

a. During the first quarter of each fiscal year, the museum staff inventories museum items vulnerable to theft. Items to inventory include small, valuable objects such as jewelry, firearms, art objects, coins, and currency. The dated inventory briefly describes each object and its location. At least one staff member other than the person preparing the inventory verifies the inventory's content by checking the objects against the inventory. Library directors include a report of this inventory in the quarterly narrative report to NL for the first quarter. Between annual inventories, the staff maintains a record of changes in location of inventoried items and the location of new additions to museum holdings subject to the inventory.

b. Annually each library conducts a physical inventory of museum items that are not subject to the valuable object inventory. The number of items to be included in the inventory is 5 percent of the museum holdings or 1000 items, whichever is less. A 5 percent sample will be selected for inventory by selecting every 20th item in the accession records of the museum. The starting point for selecting items for each year's inventory will be changed every year so that the entire collection will be inventoried over 20 years. Alternately, the inventory may consist of 1,000 items from one, or more, categories of the collection. Museums may use the inventory to identify items requiring preservation action and for identifying items for disposal. The results of the inventory must be reported in the narrative report of library activities for the quarter in which the inventory is conducted.

**1572.17 How does NARA control access to specially protected materials areas?**
Managers make every effort to reduce the need for access to holdings under special protection. Permit access only when the original material must be consulted or when the responsible manager authorizes a tour of the special area. Do not use the stack, vault, or safe for the storage of equipment, supplies, surplus publications, or other similar items that many staff may need to obtain. Facility staff and contractors must schedule any necessary access with the responsible manager and must be accompanied at all times by a staff member designated to have access to the specially protected area.

**1572.18 How is staff access to specially protected holdings areas controlled?**

a. Office heads, regional facility directors, and library directors upon the recommendation of responsible managers, designate staff members to receive the combination or key to the stack, vault, or safe containing holdings under special protection. The names of these persons and the specific areas (vault or safe location) to which they have access are forwarded to NASS.

b. Only staff and managers designated to have access to stacks, vaults, or safes containing holdings under special protection are authorized to have access to these areas or containers. Other staff members or persons allowed into the specially protected areas must be accompanied at all times by a staff member authorized to have access to the area. In the regional archives, staff not designated to have access to a secure vault or safe containing specially protected materials in an otherwise accessible stack area may have access to that stack.

c. Taking the materials outside of the area for any reason requires documentation by using NA Form 14001, or other appropriate NARA-approved form as stated in pars. 1572.7 and 1572.8.

**1572.19 How do we monitor use of a specially protected holdings area?**

a. Staff entering the secure area sign in and out on NA Form 14094, Specially Protected Area Traffic Sheet, or SF 701, Activity Security Checklist or other NARA-approved form.

b. The responsible manager retains under lock each completed NA Form 14094 or SF 701. Disposition of the forms is specified in the NARA records schedule (FILES 203), item 1442-3.

c. Some Presidential libraries control access by requiring employees to charge out the key to the special holdings area. A log of the key charge outs is maintained by the library.

**1572.20 May holdings needing special protection be taken to a research room or staff office?**

a. Whenever feasible, it is NARA policy to furnish copies in place of originals when holdings needing special protection are requested for research. LICON chiefs or other designated staff are expected to review requests made by researchers to examine original holdings needing special protection in place of copies and determine whether or not compliance is consistent with holdings protection guidance.

b. Managers may make exceptions under special circumstances on a case-by-case basis and may delegate this to the supervisor of the unit having custody of the holdings. Rare instances when access may be allowed require that a staff member with access to items needing special protection be present at all times while a researcher briefly consults such items. Consultation must be as brief as possible to limit the item's exposure to light and physical handling and limit opportunities for theft or vandalism. If managers have any question about an item's stability, consult the Document Conservation Laboratory (NWTD) or NWTS for NW holdings, NWT-L for Presidential library holdings, or NWT-R for Regional Records Services holdings before providing holdings needing special protection to a researcher.

c. Designated staff, at the discretion of the manager, may show items needing special protection to groups or visitors as part of educational or other outreach programs. Such exposure must be limited. Examples of groups and visitors that may fall into this category are participants in the Modern Archives Institute, records personnel from other agencies, and archivists or curators from other institutions and countries.

**1572.21 How are records created by this directive maintained under the NARA records schedule?**

Use the following file numbers for the functions and records described in this directive:

a. File no. 1442-2, "Records Storage and Security Files: Documents created in controlling the physical location of accessioned records and donated materials…," for:

(1) Storing and controlling removal of holdings requiring special protection. Records may include:

(a) Location registers and lists specifying storage locations of holdings (pars. 1572.5 and 1572.7, subpar. 1572.12c);

(b) Master list of all designated specially protected materials areas, maintained by NASS (subpar. 1572.12b); and

(c) Reference service slips, requests for military records, and other records documenting removal of holdings from secure storage locations for any reason (paragraph 1572.8 and subpar. 1572.18c).

(2) Changing combinations for specially protected stacks, vaults, and safes. Records may include Security Container Information forms and accompanying memoranda sent to NAS (subpar. 1572.13d); and

(3) Inspecting specially protected materials areas. Records may include:

(a) Inspection reports and lists of inspected documents prepared by inspection teams in NR and NW (subpars. 1572.14c, 1572.14e, and 1572.15);

(b) Annual inventories and related location registers of valuable objects and other museum items in the collections of Presidential libraries and Presidential Materials Projects (par. 1572.16); and

(c) Sample inventories (prepared concurrently with annual inventories) of at least 100 museum items not stored in sealed containers in Presidential libraries and Presidential Materials Projects (subpar. 1572.16b).

b. File no. 1442-3, "Records Storage and Security Files: Specially Protected Area Security Files," – for controlling and monitoring access to specially protected materials areas. Records may include:

(1) Lists of designated persons who have access to specially protected areas, maintained by managers of these areas and NASS (subpar. 1572.18a);

(2) Sign-in/sign-out forms for specially protected areas, maintained by managers of these areas (par. 1572.19); and

(3) Incident reports when security of a protected area has been compromised (subpar. 1572.20b).

c. File no. 312, "Personnel Security Clearance Files" (includes instruction for supervisors to use file no. 303-1) – for conducting background checks for staff members required to have access to specially protected materials areas (subpars. 1572.4b(1) and 1572.4c).

d. File no. 1420, "Research Room Reference Service Files" – for documenting removal of holdings for reference use by researchers and other non-NARA staff. Includes reference service slips ("pull slips") and related records (subpar. 1572.9b).

e. File no. 113-3, "Offices' Performance Reports: Feeder reports, which may be prepared quarterly, for office heads by heads of field units...," – for reporting results of museum inventories in Presidential libraries and Presidential Materials Projects. Includes the quarterly narrative reports prepared by libraries/projects and maintained by NL and the libraries/projects (subpars. 1572.16a and 1572.16b).

f. Records documenting thefts, vandalism, or other compromises of items stored in specially protected materials areas (subpars. 1572.4b(3) and 1572.20c), are unscheduled and must **not** be destroyed until the Archivist approves dispositions on an SF 115, Request for Records Disposition Authority. Organizations involved in these incidents (i.e., managers of specially protected areas, OIG, NAS, NGC), maintain the records in secure files until the Records Officer provides notification of the approved disposition(s).

# EXHIBIT 4

# DECLARATION OF GREGORY POMICTER

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE KAW NATION OF OKLAHOMA<br>Plaintiff, | ) ) ) ) | |
| v. | ) ) | No. 06-934 L<br>Judge Francis M. Allegra |
| THE UNITED STATES<br>Defendant. | ) ) ) | |

---

DECLARATION OF GREGORY POMICTER

I, Gregory Pomicter, do hereby declare:

1. I hold the position of Assistant for Operations in the Office of Regional Records Services, National Archives and Records Administration (NARA), located in College Park, Maryland. I have been the Assistant for Operations for the past nine years. I am responsible for regional archival, records management, and administrative functions of the Office of Regional Records Services. Among my overall duties, from time to time I am called upon to act as Acting Assistant Archivist for Regional Records, at which time I supervise a staff of 25. Prior to my present position, I served as Deputy Assistant Archivist for Federal Records Centers, from 1989 to 1997. From 1997 to 1999, my work focused more on Federal Records Center operations even though my title remained the same. Since that time, my responsibilities have been broadened to include archival operations in the Office of Regional Records Services.

2. I am generally familiar with the *Kaw Nation of Oklahoma v. U.S* lawsuit, the Court's Document Preservation Order ("Preservation Order") of October 24, 2007, and the parties' subsequent filings in connection with defendant's motion to modify the Court's Preservation Order. I am submitting this declaration to provide the Court with

additional information on the scope of NARA's regional holdings and to apprise the Court of the burdens imposed by plaintiff's demand for wholesale transfer and/or copying and shipping of NARA archival records in one or more regional offices to Pawnee, Oklahoma, in the event the Court is inclined both to read its prior Preservation Order to so require, and to decline further relief in the form of a modification of its Preservation Order along the lines defendant has requested.

3. This declaration is based on my personal knowledge as well as factual information gathered on my behalf by NARA staff.

*NARA's Regional Records System – General Overview*

4. The Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) and 2110. NARA currently maintains 21 regional facilities throughout the United States, in 13 states. These consist of two types of facilities: regional archives and federal records centers. Regional archives house permanently valuable records that have been transferred into NARA's legal custody, and federal records centers store temporary and permanent records that are legally owned and accessed by federal agencies. Federal agencies often possess indexes to the records to facilitate their use of the files, and until the records are transferred into NARA's legal custody the nature (*i.e.*, detail, scope, format) of the indexes may not be known to NARA.

5. Given the enormous volume of federal records that exist, agencies may also choose to physically store portions of their non-active or semi-active records in a NARA facility known as a "federal record center" ("FRC"). 44 U.S.C. § 3103 and 36 C.F.R.

Parts 1253-54. Each records center facility provides reference and other services to the federal agency that owns the records, and, upon authorization by the owning agency, to the public. NARA has physical custody of such records; however, the legal custody of the records remains with the agency that transfers the records to the NARA records center facility. In the normal course of business, such records may be disposed of or transferred to the legal custody of NARA (*i.e.,* accessioned), subject to NARA and agency approval, after all legal retention requirements have been met. (In the case of DOI records in NARA federal record centers, one or more administrative "freezes" are in effect preventing the destruction of any DOI records across all sixteen existing record groups.) *See also infra,* ¶ 16. As provided for in NARA regulations, agency record schedules normally set out a future date (*e.g.*, "after 30 years"), for the eventual transfer of legal custody to NARA of an agency's records in an FRC which have been appraised as "permanent" and therefore will be retained forever. Usually, at the time of transfer of legal custody, such permanent records are moved from FRCs to either a NARA regional or headquarters archival facility. Unless and until legal custody has been transferred to NARA, provision for access to records in FRCs is controlled by and is the responsibility of the agency that transferred the records. 36 C.F.R. 1254.8. In the normal course, once NARA has obtained legal custody of records designated as permanent, such records are open and available to the public at a NARA archival facility after processing (subject only to any restrictions imposed by the transferring agency).

6. In light of my principal duties and responsibilities for assisting in overseeing NARA's regional records programs, I will limit my discussion here to how plaintiff's interpretation of the current Preservation Order would affect NARA's regional archives

in processing and working with archival holdings throughout the United States. I support the statements made in the Declaration of Steven Tilley ("Tilley Declaration") being filed contemporaneously herewith, and will incorporate Mr. Tilley's remarks into this Declaration. I will also further discuss how we handle Preservation Orders covering records in federal records centers.

*NARA's Storage of Regional Records Relevant To This Litigation*

7. NARA's vast archival holdings include records in our Regional Archives situated throughout the United States. Just as in the case of headquarters archival records, federal records in the regional archives are arranged by the name of the government agency with which they are associated (*e.g.,* the Defense Department (formerly the War Department), the Treasury Department, the Government Accountability Office, the Department of Interior, etc.), and each of these agencies has its own bureaucratic filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. In consequence, with limited exceptions described below, NARA regional archivists would not generally be able to search records of all government agencies under the search term "Kaw Nation," to locate all records relating to this tribe. Moreover, although, as described in more detail below, most records related to the Kaw Nation tribe would be expected to be found within the Department of Interior's (DOI) record groups, NARA's regional archivists are also aware of many record groups outside of DOI that also might conceivably contain Kaw Nation-related records.

8. The records of the Department of the Interior (DOI) collectively comprise sixteen record groups, including among others located in our regional archives, Record

Group 75 (records of the Bureau of Indian Affairs (BIA)), Record Group 48 (Records of the Office of the Secretary of the Interior (OST)), and Record Group 473 (Records of the Mineral Management Service). Many of these NARA Record Groups potentially hold extremely substantial quantities of archival records. For example, we estimate that there are at least 43,345 cubic feet just of Record Group 75 BIA records known and cumulatively contained in NARA's regional archives which are dispersed across the country, in 13 cities. As each location cares for the original records pertaining to its respective region, except for any records that may have been microfilmed, no region has a NARA-generated copy of the entire collection of records that may relate to the Kaw Nation tribe.

9. As a general matter, although NARA's collections of records in each record group more or less have existing documentation and finding aids associated with them, which normally can be of use to researchers in locating records related to the Kaw Nation tribe, NARA's regional offices neither have nor generate in the ordinary course of business document-level indexes of their collections sufficient to identify all records relevant to the present lawsuit. Moreover, neither NARA's regional holdings, nor our existing regional finding aids, can be said to be differentiated or segregated into what constitute "trust" and "non-trust" records pertaining to either Indian affairs generally or Kaw Nation-related records specifically. Accordingly, to make available to plaintiff all inactive "Kaw Nation Trust records," searches would have to be devised and conducted at each of our regional archives according to ad hoc and highly variable filing systems developed over the course of the past 100 or more years by all the pertinent government agencies involved. To the extent that the Preservation Order contemplates that NARA

archivists would attempt to engage in isolating "trust" records relating to the Kaw Nation from the larger known or conceivable collections of records groups containing records relating to the Kaw Nation tribe, the Order amounts to imposing an impossible burden on this Agency's regional staff to perform.

10. Given what might be on the order of many thousands of hours involved, *see* Tilley Declaration, requiring highly-trained NARA regional staff to devote their time to a project of segregating Kaw Nation-related and/or Kaw Nation-related trust records would, in my view, effectively mean shutting down our regional archives' ability to perform the important mission of providing reference services to the public at large. Such reference services include providing guidance to individual citizens who personally visit NARA's various regional facilities, or who write, e-mail, fax, or call us, seeking guidance as to where to locate records in our vast collections. In FY 06, NARA regional staff handled 31,791 written reference requests. Also, staff of our National Personnel Records Center, which includes a regional archives, researched and responded to over one million written requests for information in personnel files (civilian and military). Most of these records are not archived; however, a significant volume of these records soon must be archived and processed for public use. In addition to handling the above forms of reference requests, NARA's regional staff also are actively engaged in processing and accessioning records, performing preservation work on existing archival record collections, screening records for privacy-related information and to ensure that only unclassified records are opened, and developing and delivering educational outreach programs supporting the needs of local educators and students. Each regional archives

performs all archival functions with less than a dozen staff members and managers, only a few of which are trained archivists.

11. No less impossible is the task of reliably segregating "all" records related to the Kaw Nation tribe for inspection by plaintiff, even without regard to a concern for their "trust" or "nontrust" status. Records pertaining to the Kaw Nation tribe -- but not indexed at the document level -- are known to exist within the holdings of the National Archives in NARA's Southwest Regional offices in Ft Worth, Texas, under the general heading of "Records of the Pawnee Agency and Subagencies." Potentially, additional Kaw Nation-related records within NARA's archival collections of BIA records are subsumed within a very large number of more generic categories, or series, including such categories as Central Classified Files, Correspondence, Office Files, School Records, Subject Files, Administrative Files, Decimal Files, Employment Assistance Case Files, Employment Assistance Data Cards, and Area Relocation Specialist Records. Adding to the complexity of use issues, the employment assistance and area relocations series named above must be handled carefully respecting privacy issues.

12. As extensive as NARA's BIA archival holdings are, they represent only a fraction of the universe of record collections potentially containing Kaw Nation-related records. As alluded to above, NARA's regional archival collections also include Record Group 48, Records of the Office of the Secretary of the Interior (596 cubic feet), Record Group 57, Records of the U.S. Geological Survey (1100 cubic feet), Record Group 79, Records of the U.S. Park Service, 1916-2005 (5919 cubic feet), Record Group 381, Records of the Office of Economic Opportunity (191 cubic feet); Record Group 115, Bureau of Reclamation (11,003 cubic feet), Record Group 435, Records of the Indian

Arts and Crafts Board (26 cubic feet), Record Group 95, Forest Service (6684 cubic feet), and Record Group 411, Records of the Government Accountability Office (124 cubic feet). Some of the record groups are known to have substantial holdings of Indian records, and may conceivably hold information about the Kaw Nation tribe; however, the vast majority of the records are neither indexed nor searchable under the name "Kaw," or "Kaw Nation." For such collections, a labor-intensive research effort would need to be undertaken to review individual collections on a file-by-file basis, to determine if records related to the Kaw Nation tribe existed.

13. For the foregoing reasons, the task of finding all or substantially all archival records in NARA regional collections actually relating to the Kaw Nation is simply not possible without a close review of what adds up to literally millions of unindexed records. NARA does not have either adequate staffing or resources to attempt to engage in isolating or indexing these vast records collections.

*NARA's Federal Records Centers*

14. NARA's Records Center holdings include records stored in the Federal Records Centers situated throughout the United States. Agency records transferred to a NARA records center remain in the legal custody of the agency that originally generated or maintained the particular records at issue. NARA acts as the agency's agent in maintaining those records. NARA is unable to disclose such records except to the agency that maintains the record.

15. As is the case with the archival records, the records of the Department of the Interior (DOI) can be found in sixteen record groups, including Record Group 75, records of the Bureau of Indian Affairs (BIA), Record Group 48, Records of the Office of the

Secretary of the Interior (OST), and Record Group 473, Records of the Mineral Management Service. NARA's Federal Records Center in Lenexa, Kansas houses the majority of the Record Group 75 holdings. Of the 160,000 cubic feet of Record Group 75 records stored in Lenexa, most have some form of indexes. These indexes may be helpful in identifying records pertaining to either Indian affairs or Kaw Nation-related records, but can not be used exclusively to locate all records relating to this tribe. The remaining DOI records stored at the regional records centers are not indexed. The task of finding all or substantially all record center holdings in NARA regional records centers relating to the Kaw Nation is simply not possible without a close review of the unindexed records. The Department of the Interior (DOI) would need to provide staff and resources to attempt to engage in isolating or indexing these vast records collections to meet the requirements of the order.

16. Since 2002, at the request of other parties NARA has placed and continues to administer an administrative freeze on the disposition (*i.e.,* destruction) of all DOI records in NARA federal records centers as the result of litigation in *Cobell v. Kempthorne*, 96CV01285 (D.D.C.). Other freezes on disposition of all or some DOI records are in effect apart from the *Cobell* case.

*NARA's Specific Objections To Plaintiff's Interpretation of The Preservation Order*

17. On NARA's behalf, I wish to lodge the following objections to plaintiff's interpretation of the Preservation Order:

18. First, NARA's founding and continuing public access policy, since the Agency's inception in 1934, has been that our public reading rooms afford access to all of our permanent archival holdings. As such, Kaw Nation-related records that are contained

in various of the above-referenced record groups generally are open and available for research and copying by plaintiff's counsel in this litigation, just as they are to all members of the public. For example, as referenced above, *supra,* ¶ 11, a large cache (constituting over 470 cubic feet), ) of publicly accessible records of the Pawnee Indian Agency and its predecessor (including Kaw Subagency records) can be found in our reading room facilities at the NARA Southwest Region, Ft. Worth Texas Regional Archives, some 300 miles due south of Pawnee, Oklahoma. As both a general matter and especially under these circumstances, NARA objects to any requirement set out in Court order that would require NARA regional staff to assume duties never before performed, including isolating "trust" records on behalf of a private party, and/or engaging in wholesale segregating out and copying of records collections available to the public solely for the convenience of their being delivered to a plaintiff party. Moreover, as a matter of principle, this Court should not shift the burden to NARA's regional staff to perform highly intensive research for the benefit of one party, given the fact that all other members of the public will suffer due to the diversion of staff resources that will ensue. In short, to the extent the current text of the Preservation Order purports to impose an additional burden on NARA staff to provide assistance to plaintiff beyond what might be reasonably provided to a member of the public asking for reference assistance, those requirements of the Order should not be enforced and should otherwise be deemed inapplicable to NARA.

19. Second, for the reasons given above, any reading of the Order to require the imposition of an obligation on NARA staff to cull out and copy Kaw Nation-related records should not be imposed, as it would place crippling burdens on NARA and its staff

and in fact should be regarded as simply impossible to comply with, given existing time and resources.

20. Third, NARA objects in the strongest terms to any requirement to move or transfer *original* copies of archival documents to Oklahoma. Any such contemplated move would risk wholesale disruption of one or more existing regional archival collections that have been stably placed in NARA's regional offices for many decades. A long laundry list of concerns going to the security, continued integrity, and preservation of our existing collections under appropriate environmental controls would arise if the Court were to order such a transfer. Simply put, NARA's archival custodial responsibilities make any proposal for shipment of records away from archival facilities untenable. It also would be fundamentally unfair to other researchers to be creating large holes in existing collections, solely for the convenience of one plaintiff party.

21. In lieu of the entry of the Preservation Order or its being made applicable to NARA archival collections, I can represent on behalf of NARA's regional staff, that NARA very much wishes to assist plaintiff in providing existing finding aids that deal primarily with records related to the Kaw Nation and other Indian tribes, so as to work with plaintiff and its representatives in an effort to find and review as many Kaw Nation-related trust records as possible. There are many senior and knowledgeable archivists regarding the records of Indian country, and we stand willing to work with plaintiff on a voluntary basis in assisting in the collection of pertinent material during the discovery phase of the present lawsuit.

22. In sum, plaintiff's preferred reading of the Order would cripple NARA's ability to perform its important mission to U.S. citizens, by hugely diverting scarce staff

resources for a collection, copying and transfer of records enterprise of vast dimension, but uncertain utility and result, in any reasonable time frame. Any such interpretation of the standing Preservation Order would also impose unprecedented burdens on this Agency to the extent it requires the expenditure of resources towards the isolation or segregation of particular types of records otherwise fully open and available to the public, merely on behalf of a party seeking records in furtherance of litigation. On behalf of this agency, I urge the Court not to read into the existing Preservation Order any such requirement for the transfer of records, or any other requirement that would impose such severe burdens on NARA and its regional staff, and severely constrain NARA's ability to serve the public at large, including those who seek research assistance and access to NARA holdings

I declare under penalty of perjury that the foregoing is true and correct.

Gregory Pomicter
GREGORY POMICTER

Executed on this 18 day of January, 2008

# EXHIBIT 5

# DECLARATION OF BRUCE MAYTUBBY

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **KAW NATION,** <br><br> Plaintiff <br><br> v. <br><br> **UNITED STATES OF AMERICA** <br><br> Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 06-cv-00934-FMA** <br><br> **Declaration of Bruce Maytubby IN SUPPORT OF DEFENDANT'S REPLY TO THE KAW NATION'S RESPONSE TO DEFENDANT'S MOTION TO MODIFY DOCUMENT PRESERVATION ORDER** |

I, Bruce W. Maytubby, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Bureau of Indian Affairs ("BIA") Deputy Regional Director, Trust Services, of the Southern Plains Region. I have been employed by BIA since June 1977 and have held my current position since December 1988. As Deputy Regional Director, Trust Services, I have been familiar since at least 2002 with the Department of Interior's policy that requires that all Indian fiduciary trust records be preserved indefinitely, and forbids their destruction in any case. I am also familiar with the Orders issued by the Court with regard to the above litigation and the need to preserve all relevant records pertinent to this case.

2. The Southern Plains Regional Office is located in Anadarko, Oklahoma, and currently maintains title records (aperture cards, microfilm, and electronic records) and miscellaneous historical records for the Kaw Nation.

3. As the Regional Office that houses Kaw Nation records, our main responsibility to the Tribe is acting as both the principal agent of the United States in carrying out the government-to-government relationship with the Nation and the principal trustee for the United States with regard to their trust property. This responsibility was accomplished through the Pawnee Agency (principal field office having jurisdiction over the Kaw Nation) until the Nation and Bureau entered into a Self-Governance Compact (25 U.S.C. §455-457) on January 6, 1996. Upon execution of the Compact, the Nation became responsible for the administration of certain Federal programs (inclusive of the administration of the Real Estate Services program) as set forth in the Annual Funding Agreement. When the Tribe compacted in 1996, they took control over the services formerly provided them by the Southern Plains Regional Office.

4. While inactive Kaw Nation records are maintained at the BIA Regional Office until they are transferred to the American Records Repository ("AIRR") in accordance with the current record retention schedule, active Kaw Nation records are used on a regular basis to conduct BIA business by providing technical assistance in processing real estate transactions, responding to issues that are historical in nature, maintaining land titles for the Kaw Nation (pursuant to 25 CFR §150), and handling other matters related to the Secretary's trust responsibility. Gathering Kaw Nation records at the Regional Office involves several steps that include, but are not limited to: consultation with the Records Liaison for the identification and movement of records and segregation of Kaw Nation title document from those title documents belonging to other Tribes.

5. Moving these active records from the BIA Southern Plains Regional Office to the IBA Pawnee Agency office would create an undue burden, particularly with completing title maintenance duties, on the Regional Office in handling its responsibilities to the Tribe. The identification of Kaw Nation records within the Land titles system of records could involve a search of the following:

| Record | Volume |
|---|---|
| 1. Aperture cards | 67,921 cards |
| 2. 35mm film rolls | 99 rolls (approx. 310,500 pages) |
| 3. 16mm film rolls | 424 rolls (approx. 1,764,700 pages) |
| 4. Microfilm/jackets | 90,688 (by linear foot calculations) |

6. The process of identifying and gathering Kaw Nation documents from the volume of available active Kaw Nation records is tedious, because copies of the title records are listed in the recording system based on the date the documents are recorded, not by the name of the Tribe. To identify, search and gather title records as they pertain to the Kaw Nation for purposes of moving them from the BIA Southern Plains Regional Office to another location would interfere with BIA's regular business practices. Land title personnel would be redirected from completing title related work and relegated to searching through volumes of records to identify and photocopy those that relate specifically to Kaw Nation.

Executed on January 17, 2008.

Bruce W. Maytubby

# EXHIBIT 6

# DECLARATION OF RICHARD FIELITZ, JR.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **KAW NATION,** | ) | **Case No. 06-cv-00934-FMA** |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **Declaration of Richard P. Fielitz, Jr.** |
| **v.** | ) | **IN SUPPORT OF DEFENDANT'S** |
| | ) | **REPLY TO THE KAW NATION'S** |
| | ) | **RESPONSE TO DEFENDANT'S** |
| **UNITED STATES OF AMERICA** | ) | **MOTION TO MODIFY** |
| | ) | **DOCUMENT PRESERVATION** |
| | ) | **ORDER** |
| **Defendant** | ) | |
| | ) | |

I, Richard P. Fielitz, Jr. pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Chief of Staff for the Office of the Special Trustee for American Indians ("OST") in the Department of the Interior. I have held this position since October 28, 2007, and I have been employed by OST since May 2004. My duties include oversight responsibilities for various OST functions, including litigation support. I am also the Records Retention Orders (RRO) Compliance Coordinator for OST. As stated in prior filings, I am familiar with the Department of Interior's policy that requires that all Indian fiduciary trust records be preserved indefinitely, and forbids their destruction in any case.

2. Kaw Nation records are currently maintained in the following locations: OST Albuquerque, New Mexico, OST and Office of Historical Trust Accounting ("OHTA") in Washington, DC; American Indian Records Repository ("AIRR") in Lenexa, Kansas; Office of Appraisal Services-Southern Plains Region Lawton, OK and the Pawnee Agency for Bureau of Indian Affairs ("BIA") in Pawnee, OK. Materials in Albuquerque include materials related to the Tribe's PL 93-638

Compact and Appraisal program Memorandum of Understanding ("MOU"), transaction histories, cash receipts, disbursing transactions, investment and portfolio documents, electronic and hard copy reports, correspondence and work papers related to Tribal review and audits (by the Office of Trust Review & Audits) and various miscellaneous files. Materials in Washington, DC relate to the Tribe's PL 93-638 Compact and Appraisal program Memorandum of Understanding ("MOU"), (main interior) and hard copy documents and electronic images of various financial documents, accounting firm work products and correspondence between contractors (OHTA). Materials in Lenexa, KS include boxes which may hold relevant information and associated record series created for the Kaw Nation located at the AIRR. Materials in Lawton, OK are working papers and reports related to appraisals associated with the Kaw Nation.

3. The Kaw Nation records that are maintained at the various OST locations are used throughout the normal course of operations, specifically to conduct the Office's routine business affairs. Many of these files are used for the verification of operations and the confirmation of past factual information required for future analysis and transactions. Such reports and data are the genesis of future reports and analysis.

4. Shipping Kaw Nation records from these various locations would interrupt OST from doing what is needed to conduct our normal business. Many of these are reports are working papers, used in the normal course of our daily business. In addition, moving records from AIRR is in violation of the Departmental Policy which was implemented to help safeguard and maintain the integrity of the records. The policy requires that once records are stored at AIRR, they will not leave the facility.

Executed on January 17th, 2008.

[signature]

Richard P. Fielitz, Jr.

# EXHIBIT 7

# DECLARATION OF PAULETTE SANFORD

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KAW NATION,<br><br>Plaintiff<br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant | Case No. 06-cv-00934-FMA<br><br>**Declaration of Paulette Sanford IN SUPPORT OF DEFENDANT'S REPLY TO THE KAW NATION'S RESPONSE TO DEFENDANT'S MOTION TO MODIFY DOCUMENT PRESERVATION ORDER** |

I, Paulette Sanford, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Record Retention Order Compliance Coordinator for the Bureau of Land Management ("BLM"), a position I have held since October 8, 2006. I have been employed by BLM since April 13, 1997 and my responsibilities include the coordination and management of BLM's Information Technology ("IT") programs, as they relate to Indian trust issues and the implementation of applicable Department of Interior (DOI) policies and directives. BLM's IT programs conduct backup and recovery activities for electronic data processing applications and electronic mail operations. BLM is a complex organization that includes Offices throughout the Mid-West and Eastern states and has a unique mission to protect and preserve our nation's lands for future and present generations. Because of this, BLM has implemented a robust Records Management Program that is aimed at ensuring all BLM's records are maintained at secure locations. Prior to my employment with BLM, I worked in various federal service positions, and used records retention and disposition schedules as they relate to records. I am now familiar with how these record retention and disposition schedules relate to Indian trust records.

2. BLM maintains several file rooms that contain paper documents and electronic records (microfiche) for Kaw Nation at the BLM offices in Tulsa and Moore, Oklahoma. The type of records BLM currently maintains for Kaw Nation at these locations include, but are not limited to: oil & gas or mining activity case files. In addition to Kaw Nation records, these file rooms also contain records for other Tribes. In 2001, inactive records for Kaw Nation were classified as "permanent" and are currently retained at the local Tulsa and Moore, OK sites.

3. Kaw Nation oil & gas and mining activity case files must be maintained at their current locations because they are used to conduct regular BLM business. On a daily basis, these records are used to assist BLM in their ability to review Indian materials for diligent development and to conduct associated activities for operations. Maintaining oil & gas and mineral records at these Tulsa and Moore, OK sites, enables BLM to update the records for day to day operations. Also, BLM may receive a request from the Bureau of Indian Affairs ("BIA") to conduct a cadastral survey on a piece of land for a Tribe. After the surveys are completed, BLM retains the survey information and the cadastral survey.

4. To require that BLM move Kaw Nation records from its Tulsa and Moore, OK sites, and ship those records to Pawnee, OK, will create a financial hardship by diverting financial resources from other business programs. The initial step of copying these records is an overwhelming burden to BLM. One or more current employees would be moved from handling their existing responsibilities and tasked with searching through all the existing BLM records at these Tulsa and Moore, OK sites for Kaw Nation records. Until an exhaustive search is made, BLM can not ascertain an exact number of records that exist for the Kaw Nation at these locations. Depending on how many records are found, those would have to be copied and shipped, which creates an additional burden on BLM's already diminishing budget, resources and limited staff. Most importantly, a transferring of such records to the BIA Pawnee Agency in Pawnee, OK will interfere with

BLM's ability to handle its daily responsibilities of resolving issues as they relate to oil & gas and minerals activities.

Executed on January 17, 2008.

Paulette Sanford
Paulette Sanford

# EXHIBIT 8

# DECLARATION OF JULIA LANGAN

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **KAW NATION,** | ) | **Case No. 06-cv-00934-FMA** |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **Declaration of Julia Langan** |
| **v.** | ) | **IN SUPPORT OF DEFENDANT'S** |
| | ) | **REPLY TO THE KAW NATION'S** |
| | ) | **RESPONSE TO DEFENDANT'S** |
| **UNITED STATES OF AMERICA** | ) | **MOTION TO MODIFY** |
| | ) | **DOCUMENT PRESERVATION** |
| | ) | **ORDER** |
| **Defendant** | ) | |
| | ) | |

I, Julia Langan, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Superintendent of the Pawnee Agency for the Bureau of Indian Affairs ("BIA"), a position I have held since February 1987, and I am responsible for serving as the line Official for a Multi-tribal Agency in charge of administering, planning, organizing, directing, controlling, coordinating and evaluating program operations for the BIA at the Pawnee Agency. The Agency is located in Pawnee, Oklahoma with five Tribes residing in the jurisdiction of the Agency. They are identified as follows: Kaw Nation, Otoe-Missouria Tribe of Indians, Pawnee Nation, Ponca Tribe and Tonkawa Tribe. The Kaw Nation has compacted all of their programs from the Pawnee Agency, essentially taking over the services formerly provided by the Agency, and the Ponca Tribe has compacted all of their programs with the exception of Real Estate, Land Operations, Probate and Child Protection Services. Presently, there are twelve (12) employees at the Pawnee Agency. Our single-floor building houses the offices for the following: Farming & Grazing, Land Operations, Oil & Gas, Acquisition & Disposal, Social Services, Probate, Administration and Executive Direction, as well as offices for supplies and server/information technology ("IT") rooms. The Office of the Special Trustee for American

Indians also has four (4) employees that are duty stationed at the Pawnee Agency.

2. As Superintendent for the Pawnee Agency, my responsibilities include, but are not limited to handling matters involving Indian Trust Responsibilities, Real Estate Services, Lease Compliance, Indian Services (Social Services/Child Abuse), Administration and Facilities/Safety Management, as well as facilitating Government-to-Government Relationships with the Tribes under the jurisdiction of the Pawnee Agency.

3. The Pawnee Agency of the BIA currently maintains approximately 2 cubic feet (2 file drawers) of Kaw Nation records. These drawers consist of records that pertain to (among other things) Condemned lands, Tribal Government and Pre-Compact negotiation files. As mentioned prior, the Kaw Nation is a Compact Tribe who, by desire, has dealt directly with the Southern Plains Regional Office of BIA, not the Agency. Kaw Nation compacted all of their programs on January 6, 1996, and the Agency's knowledge of their current affairs and record management for the Tribe ceased on that date. Although Kaw Nation is a compacted Tribe, the two (2) cubic feet of records retained by the Pawnee Agency are available for reference if any issues arise regarding these condemned lands.

4. In May, 2005, the Associate Deputy Secretary issued a directive that directed compliance with the preparing and shipping inactive records to the American Indian Records Repository ("AIRR"), Office of Trust Records ("OTR") in Lenexa, Kansas. Any movement of records would need to be coordinated through that office. The movement of Kaw Nation records from other entities to the Pawnee Agency for review would place the Agency in violation of the current established policy of the Office of Special Trustee ("OST") in regards to placement of inactive records.

5. The available storage space at the Agency is very limited and would not be conducive to maintaining additional records from other entities. Because of this limited storage and up until the freeze on shipment of trust records to the AIRR, the Pawnee Agency has actively sent inactive records to the AIRR. This building

was constructed in 1932 and has wooden floors, which cannot support additional fireproof files over and above what we are currently maintaining. The building is on the Historical Register listing and was originally built to be used as a school; consequently, the walls are 6-inch lath construction which does not allow for office movement of walls to accommodate desired changes. Temperature control of this building in the summer and winter months has been always been an issue (heat and air-condition may not always operate properly). The Pawnee Agency does not have the space to accommodate a move of additional records from other entities to these facilities. Also, the Agency can not spare the monetary expenses nor additional manpower which may be needed for a review of such other records for Kaw Nation. When the Kaw Nation compacted their programs in 1996, the Agency's resources and staff allocated to those programs were given to the Tribe to perform those program services, formerly provided by the BIA.

Executed on January 17th, 2008.

Julia Langan

Julia Langan

# EXHIBIT 9

# MAPQUEST DIRECTIONS FROM OKLAHOMA CITY, OK TO ANADARKO, OK

MAPQUEST

**Start:** Oklahoma City, OK US

**End:** Anadarko, OK US

**Notes:**
Only text visible within note field will print.

Do you know YOUR Score?
Your Credit Score
Your Interest Rate
Find out instantly!

| Directions | | Distance |
|---|---|---|
| **Total Est. Time:** 1 hour, 7 minutes **Total Est. Distance:** 60.54 miles | | |
| START | **1:** Start out going EAST on W MAIN ST toward N BROADWAY AVE. | <0.1 miles |
| | **2:** Turn RIGHT onto N BROADWAY AVE. | <0.1 miles |
| | **3:** Turn RIGHT onto W SHERIDAN AVE. | 0.1 miles |
| | **4:** Turn LEFT onto S ROBINSON AVE. | 0.2 miles |
| WEST 40 | **5:** Merge onto I-40 W / US-270 W. | 3.1 miles |
| WEST 44 | **6:** Merge onto I-44 W / OK-3 E / OK-74 S via EXIT 147A on the LEFT toward LAWTON. | 4.7 miles |
| WEST 44 | **7:** Merge onto I-44 W via EXIT 1A toward LAWTON (Portions toll). | 17.8 miles |
| WEST 44 | **8:** Keep RIGHT at the fork to continue on I-44 W (Portions toll). | 14.2 miles |
| 83 EXIT | **9:** Take the US-62 exit- EXIT 83- toward CHICKASHA. | 0.2 miles |
| WEST 62 | **10:** Turn RIGHT onto US-277 S / US-62 W / OK-9 W / OK-92 S. Continue to follow US-62 W / OK-9 W. | 19.6 miles |
| EAST 62 | **11:** Make a U-TURN at US-281 onto US-62 E / CENTRAL BLVD / E CENTRAL AVE / OK-8 S / OK-9 E. | <0.1 miles |
| END | **12:** End at **Anadarko, OK US** | |
| **Total Est. Time:** 1 hour, 7 minutes **Total Est. Distance:** 60.54 miles | | |




**Start:**
**Oklahoma City, OK US**

**End:**
**Anadarko, OK US**







All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.