# In The United States Court of Federal Claims

No. 06-934L

(Filed:  February 29, 2012)

_____

|  |  |
|---|---|
| THE KAW NATION OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * Tribal trust case; Motion to dismiss under<br>* RCFC 12(b)(1); 28 U.S.C. § 1500; *Tecon*<br>* *Engineers* – "order-of-filing"; *Tecon* remains<br>* good law – neither expressly nor impliedly<br>* overruled by *Tohono O'odham*; *Tecon* ruling<br>* consistent with plain meaning of section<br>* 1500; Legislative history of section 1500<br>* does not contradict its plain meaning; Policy<br>* considerations do not warrant abandonment<br>* of either the statute or *Tecon*'s interpretation<br>* thereof; "Same-day-filing" rule of<br>* *Passamaquoddy Tribe* rejected; Motion<br>* denied.<br>* |

_____

## OPINION

_____

*Kennis Monte Bellmard, II*, McCormick & Bryan, P.L.L.C., Edmond, Oklahoma, for plaintiff.

*Terry M. Petrie,* Environment and Natural Resources Division, United States Department of Justice, and *Jared Pettinato* (argued), Office of the Solicitor, United States Department of the Interior, with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

This is one of several cases in which defendant has moved to dismiss a plaintiff's complaint under RCFC 12(b)(1), asserting that the subsequent filing of a district court action serves to divest this court of subject matter jurisdiction over an earlier-filed case under 28 U.S.C. § 1500, as interpreted in *United States v. Tohono O'odham Nation*, 131 S. Ct. 1723 (2011).  For the reasons that follow, this court denies defendant's motion, as it finds, relying on binding precedent, that section 1500 is inapplicable to the case *sub judice*.

**I.**

The facts required here are simple and few.[1]

The Kaw Nation of Oklahoma (the Nation or plaintiff) alleges that the United States (defendant) has breached its duties as trustee of certain assets of the Nation, resulting in financial losses.[2]  The original complaint that plaintiff filed with this court on December 29, 2006, sought an accounting, declaratory and injunctive relief, as well as monetary compensation.  Hours after commencing this action, the Nation filed a separate action in the United States District Court for the Western District of Oklahoma, *The Kaw Nation of Oklahoma v. Kempthorne*, No. 5:06–cv–01437-W (W.D. Okla. filed December 29, 2006), alleging what appear to be the same operative facts and seeking similar relief (*e.g.*, an accounting, declaratory and injunctive relief).  For purposes of this motion, defendant has stipulated that the action in this court was filed before the companion action was commenced in the district court.

On March 23, 2007, plaintiff filed an amended complaint, which seeks money damages, declaratory judgment, and injunction.  On January 25, 2008, this court, at the request of both parties, stayed this matter and referred the case to alternative dispute resolution.  In a series of orders, the district court did essentially the same.  On July 1, 2011, defendant filed a motion to lift the stay and to dismiss plaintiff's complaint for lack of subject matter jurisdiction under 28 U.S.C. §1500.  Defendant has not moved to dismiss the companion district court action and the stay in that case remains in effect.  *See The Kaw Nation v. Kempthorne*, No. 5:06-cv-01437-W (W.D. Okla. Jan. 13, 2012).

**II.**

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp.*, 550 U.S. at 554-55.  In particular, the plaintiff must establish that the court has subject matter jurisdiction over its claims.  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Here, defendant claims that jurisdiction is lacking owing to the application of 28 U.S.C. § 1500.

---

[1]  These facts are drawn from plaintiff's complaint and, for purpose of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  Additional procedural details are drawn from the docket of plaintiff's district court action.

[2]  The Kaw Nation is a federally-recognized Indian tribe, organized pursuant to the Oklahoma Indian Welfare Act of 1936, ch. 831, 49 Stat. 1967, codified at 25 U.S.C. § 501 *et seq.*, and operating under a constitution adopted by the Nation and approved by the U.S. Department of the Interior on August 4, 1990.  *See Kaw Nation v. Norton*, 405 F.3d 1317, 1318 (Fed. Cir. 2005).

## A.

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The Nation asserts federal subject-matter jurisdiction under the Indian Tucker Act (as it is colloquially known), 28 U.S.C. § 1505. That Act provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

28 U.S.C. § 1505. The reference in this provision to "which otherwise would be cognizable in the Court of Federal Claims" incorporates the Tucker Act, 28 U.S.C. § 1491. *United States v. Navajo Nation*, 537 U.S. 488, 503 n.10 (2003). The latter provision, in turn, grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). "If a claim falls within the terms of the [Indian] Tucker Act," the Supreme Court has held, "the United States has presumptively consented to suit." *Mitchell*, 463 U.S. at 216; *see also United States v. Navajo Nation*, 537 U.S. at 503; Gregory C. Sisk, "Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity," 39 Tulsa L. Rev. 313, 316-17, 320 (2003).

Section 1500 of Title 28 provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500. "[T]he words of the statute are plain," the Supreme Court long ago stated, "with nothing in the context [with the] meaning doubtful." *Corona Coal Co. v. United States*, 263 U.S. 537, 540 (1924); *see also Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1565 (Fed. Cir. 1988), *cert. denied*, 489 U.S. 1066 (1989). Those words speak in terms of subject matter jurisdiction and, as later described by the Supreme Court, "bar jurisdiction over the claim of a plaintiff who, upon filing [with the Court of Federal Claims], has an action pending in any other court 'for or in respect to' the same claim." *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993); *see also Nez Perce Tribe v. United States*, 83 Fed. Cl. 186, 189 (2008). To determine whether this statute applies here, the court must answer two fundamental questions:

(i) whether the district court action was "pending" at the time jurisdiction under section 1500 is measured; and (ii) if so, whether the claims presented to the district court were the same as those in the instant case. *See Griffin v. United States*, 85 Fed. Cl. 179, 184 (2008), *aff'd*, 621 F.3d 1363 (Fed. Cir. 2010); *Firebaugh Canal Water Dist. v. United States*, 70 Fed. Cl. 593, 597 (2006).

The answer to first of these questions is controlled by *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), *cert. denied*, 382 U.S. 976 (1966). In that case, the plaintiffs were displeased with the progress of their case before the Court of Claims and decided to take their dispute elsewhere. They filed suit in a district court and then sought to dismiss their earlier-filed Court of Claims case under section 1500, claiming that the latter court lost jurisdiction once the plaintiffs elected to bring suit in district court. *Id.* at 946. The Court of Claims disagreed, holding that the later-filed district court suit did not oust it of jurisdiction to hear the prior-filed Tucker Act claim – a holding sometimes referred to as the "order-of-filing rule." The court observed that this construction of section 1500 was consistent with "[t]he long established rule of comity . . . that the court . . . which first obtains and exercises . . . jurisdiction, retains jurisdiction until a final judgment is entered." *Id.* at 946. It then traced the legislative history of the statute back to its roots in 1868. *Id.* at 946-49. Regarding this history, it noted that reading the "has pending" language as not being triggered by a later-filed district court suit comports with the original version of section 1500, which talked in terms of a suit that an individual "shall have commenced and has pending." *Id.* at 949. Based upon this analysis, the Court of Claims concluded that "the only reasonable interpretation of [section 1500] is that it serves to deprive this court of jurisdiction of any claim for or in respect to which plaintiff has pending, in any other court any suit against the United States, only when the suit shall have been commenced in the other court before the claim was filed in this court." *Id.* The court then dismissed the plaintiff's complaint with prejudice.

The Federal Circuit repudiated *Tecon* in its *en banc* decision in *UNR Indus. Inc. v. United States*, 962 F.2d 1013, 1021 (Fed. Cir. 1992). But, when the latter decision was affirmed, *sub nom.*, by the Supreme Court in *Keene*, the Supreme Court found it "unnecessary" to consider *Tecon*. *Keene*, 508 U.S. at 216. Thereafter, in *Hardwick Bros. Co. II v. United States*, 72 F.3d 883, 886 (Fed. Cir. 1995), the Federal Circuit declared unequivocally that "*Tecon Engineers* remains good law and binding on this court." *See also Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1549 n.10 (Fed. Cir. 1994) (en banc) (noting that *Tecon* "held that a later-filed action in another court does not oust the Court of Federal Claims of jurisdiction over an earlier-filed complaint" and that this decision was not overturned in *UNR/Keene*).

Defendant contends, however, that *Tecon* is no longer good law in this circuit because it was overturned by *Tohono*. This argument does not withstand scrutiny.

Despite defendant's claims, it is abundantly clear that *Tohono* did not expressly overrule *Tecon.* The majority's opinion unambiguously stated that "[t]he *Tecon* holding is not presented in this case because the [Court of Federal Claims] action here was filed after the District Court suit." *Tohono*, 131 S. Ct. at 1729-30; *see also Tohono*, 131 S. Ct. at 1735 n.5 (Sotomayor, J.,

concurring) ("As the majority notes, . . . the validity of the Court of Claims' holding in [*Tecon*] is not presented in this case.  This Court has never considered that holding.").  Only by donning blinders to this language can defendant make its contrary argument – and this court will not likewise engage in willful blindness.  The other judges of this court appear similarly inclined, as evidenced by an unwavering phalanx of decisions that have all concluded that *Tohono* did not overrule *Tecon*.  *See Yakama Nation Housing Authority v. United States,* 2011 WL 6062362, at *5 (Fed. Cl. Dec. 5, 2011) ("the *Tohono O'odham* court neither considered nor overruled *Tecon* in its application of § 1500"); *Coeur d'Alene Tribe v. United States,* 2011 WL 5822177, at *7 (Fed. Cl. Nov. 18, 2011) ("The *Tohono* Court, however, declined to either overrule or explicitly endorse *Tecon*'s order-of-filing rule, and it did not indicate otherwise that *Tecon* is no longer good law."); *Nez Perce Tribe v. United States,* 101 Fed. Cl. 139, 145 (2011) ("the *Tecon* timing rule" remains "undisturbed").[3]

Undaunted, defendant urges this court to read between the lines and view the Supreme Court as having implicitly overruled *Tecon* when it commented negatively on Federal "Circuit precedent that left [section 1500] without meaningful force." *Tohono,* 131 S. Ct. at 1729.  But, even if it agreed with the gloss defendant puts on this fragment – which it does not – the court is powerless to disregard binding circuit precedent on the mere belief that a subsequent Supreme Court opinion casts doubt on a prior decision of the Court of Claims or Federal Circuit.[4]  As this court recently noted in rejecting a similar claim, "[t]he Federal Circuit . . . seems to have a more restrictive view of *stare decisis*" than defendant.  *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 733 (2011).  Thus, in *El-Shifa Pharmaceutical Industries Co. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005), the United States urged the Federal Circuit to overrule *Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953), on the basis of the Supreme Court's later decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259

---

[3]   Some of these cases reject a well-worn claim that defendant repeats yet again here – that *Tecon* has never been controlling precedent in this circuit because two pre-*Tecon* cases in the Court of Claims held that section 1500 applies even when the case is filed in this court first. *Tecon*, however, directly addressed these cases – *Hobbs v. United States*, 168 Ct. Cl. 646, 647-48 (1964) (per curiam) and *Maguire Indus., Inc. v. United States*, 86 F. Supp. 905, 906-07 (Ct. Cl. 1949), *cert. denied*, 340 U.S. 809 (1950) – holding that they provide no direction on the timing issue because "there [was] no indication that the issue of priority was ever fully briefed, considered or decided." *Tecon*, 343 F.2d at 950.  *Tecon* also noted that, for a variety of reasons, these cases were factually distinguishable.  *Id.* at 950 & n.3 (distinguishing *Maguire* as a case involving litigation already pending when suit was brought in the Court of Claims).  Hence, these decisions provide no basis for this court to disregard *Tecon*.  *See Pelligrini v. United States*, 2012 WL 171912, at *3 n.4 (Fed. Cl. Jan. 20, 2012); *Coeur d'Alene Tribe*, 2011 WL 5822177, at *7 ("The court is not persuaded by the Government's characterization of the case law."); *see also Spodek v. United States*, 44 Fed. Cl. 32, 40-42 (1999) (disregarding these decisions in giving effect to *Tecon*).

[4]   In *S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc), the Federal Circuit adopted the precedent of the Court of Claims as its own.

(1990). While *Turney* had applied the Fifth Amendment to an alien claiming a takings in a foreign land, 115 F. Supp. at 464, *Verdugo-Urquidez* construed prior Supreme Court cases as having "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." 494 U.S. at 269. Although it viewed these two holdings as irreconcilable, the panel in *El-Shifa* refused to declare *Turney* no longer the law, stating, "[w]e cannot simply overrule the [*Turney*] decision, even if we were persuaded . . . that it is appropriate; to overrule a precedent, the court must rule en banc." *El- Shifa*, 378 F.3d at 1352 (quoting *George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351 (Fed. Cir. 2003), *cert. denied*, 543 U.S. 808 (2004)).

*El-Shifa* is among many cases that have recognized this limitation. The Federal Circuit, indeed, often has emphasized the binding nature of its decisions and the corresponding inability of a panel to depart from such precedents.[5] If a panel of circuit judges cannot overrule a prior precedent of that court, this court obviously cannot. *See Jicarilla Apache Nation*, 100 Fed. Cl. at 734 ("Logic and common sense suggest that if a panel of that court lacks the authority to overrule a prior circuit decision, then this court also must lack that authority. To conclude otherwise would be folly."). Therefore, the court declines defendant's blithe invitation to "underrule" the Court of Claims' decision in *Tecon*. *See Jicarilla Apache*, 100 Fed. Cl. at 734 (rejecting defendant's argument that this court overrule *Cheyenne-Arapaho Tribes of Indians of Okla. v. United States*, 512 F.2d 1390 (Ct. Cl. 1975), on the basis of *Jicarilla Apache Nation v. United States*, 131 S. Ct. 2313 (2011)); *see generally*, *Consol. Edison Co. of N.Y., Inc. v. U.S. Dept. of Energy*, 247 F.3d 1378, 1386 (Fed. Cir. 2001) (Plager, J., concurring).[6] "Obedience to a

---

[5] *See Palmer v. Merit Sys. Protection Bd.*, 550 F.3d 1380, 1384 (Fed. Cir. 2008); *Atamirzayeva v. United States,* 524 F.3d 1320, 1327 (Fed. Cir. 2008), *cert. denied*, 555 U.S. 1170 (2009); *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008); *Fed. Nat'l Mortg. Ass'n v. United States*, 469 F.3d 968, 972 (Fed. Cir. 2006), *cert. denied*, 552 U.S. 1139 (2008); *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007) ("Panels of this court are bound by previous precedential decisions until overturned by the Supreme Court or by this court en banc."); *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 963 n.2 (Fed. Cir. 2005), *rev'd on other grounds*, 549 U.S. 118 (2007); *Sacco v. Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003) ("A panel of this court is bound by prior precedential decisions unless and until overturned *en banc*."); *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988), *cert. denied*, 493 U.S. 814 (1989); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860, 863 (Fed. Cir. 1985); *see also* 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *et al.*, Fed. Prac. & Proc. § 3506 (3d ed. 2010). In one decision cited by defendant, the Federal Circuit suggested that the rule is different if a Supreme Court decision is "directly at odds" with an earlier Federal Circuit precedent. *Doe v. United States*, 372 F.3d 1347, 1356-57 (Fed. Cir. 2004), *cert. denied*, 544 U.S. 904 (2005). But, even assuming that this case is not an anomaly, the circumstances described in *Doe* are not present here.

[6] Seeking to bootstrap its *Tohono* arguments, defendant quotes from Federal Circuit cases that, on occasion, have opined that courts ought to follow "explicit and carefully considered" *dicta* in Supreme Court opinions. *Stone Container Corp. v. United States*, 229 F.3d

Supreme Court decision is one thing," the Eleventh Circuit recently stated in rejecting an argument like defendant's, "extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another."  *Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007).

Accordingly, this court holds that *Tecon* remains good law, even after *Tohono*, and, therefore, controls this case.

**B.**

Ordinarily, the court would apply *Tecon* and be done with this case.  But, in light of defendant's sustained assault on *Tecon*, as part of what appears to be a systematic effort to expand the prophylactic effect of section 1500 on this court's jurisdiction, it bears repeating why *Tecon* was correctly decided.

**1.**

We begin, as we must,[7] with the language of the statute, which the Federal Circuit has described as being "quite explicit."  *Johns-Manville Corp.*, 855 F.2d at 1565.  That language indicates that section 1500 is triggered only where the plaintiff "has pending" a lawsuit in another court.  In the first of his enlightening opinions in *Nez Perce Tribe*, Judge Lettow construed this language thusly – "[g]rammatically, the words 'has pending' in the statute constitute a present participle which 'convey[s] the same meaning' as the present perfect tense and 'indicates action that was started in the past and has recently been completed or is continuing up to the present time."  83 Fed. Cl. at 189 (citing William A. Sabin, The Gregg Reference Manual §§ 1033-34, at 272-73 (10th ed. 2005)); *see also Nez Perce Tribe v. United States*, 101 Fed. Cl. 139, 145 (2011); *Berry v. United States*, 86 Fed. Cl. 24, 28 (2009).  As a matter of abstract linguistics, this interpretation accords with common definitions of the word "pending,"

----

1345, 1349-50 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 971 (2001); *see also Ins. Co. of the West, v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001).  But, there is a problem – there is no "explicit and carefully considered" *dicta* on the point in question in *Tohono*.  Even if there were, it would be paradoxical for any court, in the name of *stare decisis*, to treat the Supreme Court as having resolved an issue that it explicitly declined to resolve.  *Cf. El Paso Co. v. United States*, 694 F.2d 703, 711 (Fed. Cir. 1982) (stating, regarding Supreme Court *dicta*:  "Usually . . . one seeking valid precedents will pay more attention to what courts actually do with the case before them, than to dicta pronouncing rules textually extending beyond the facts of that case . . . ).

[7]  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).  In analyzing this language, the court is mindful of the "fundamental canon of statutory construction," *to wit*, that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42 (1979).

when used, as here, as an adjective. *See* Black's Law Dictionary 1134 (6th ed. 1990) ("an action or suit is 'pending' from its inception until the rendition of final judgment.").[8]  The connotation that a "pending" action must have been already filed, moreover, becomes stronger when that word is combined with "has" to convey the same meaning as the present perfect tense – a tense that the Supreme Court, in construing other jurisdictional provisions, has indicated "denote[s] an act that has been completed." *Barrett v. United States*, 423 U.S. 212, 216 (1976) (construing the phrase "has been"); *see also Nez Perce*, 83 Fed. Cl. at 189; Chicago Manual of Style 237 (16th ed. 2010) (indicating that the use of this tense is appropriate where a past event has present significance).[9]  This plain meaning analysis of the phrase "has pending" leads to the conclusion that "for a district court case to prime this court's jurisdiction, it must be 'started in the past,' and thus be pending **before** the case in this court is filed or deem filed." *Griffin*, 85 Fed. Cl. at 187 (emphasis in original).

Indication that this understanding is firmly rooted in the text of section 1500 may be found in decisions interpreting the same or similar language in other statutes.[10]  Among these decisions is *Amendola v. Sec'y of Health and Human Servs.*, 989 F.2d 1180, 1184 (Fed. Cir. 1993).  There, the Federal Circuit construed one of the effective date provisions in the National Vaccine Injury Compensation Act, 42 U.S.C. § 300aa-11(a)(5), which permitted a plaintiff "who on the effective date of this subtitle *has pending* a civil action for damages for a vaccine-related injury or death" to withdraw that action and file a petition under the Vaccine Act.  (Emphasis added).  The Federal Circuit held that the "has pending" language applied to "those who had already filed an action for damages" prior to the statute's effective date.  *Amendola*, 989 F.2d at 1184; *see also Griffin*, 85 Fed. Cl. at 187 & n.5.  Likewise, in *Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999), the Sixth Circuit held that a district court case was not "pending," for purposes of the effective date provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28

---

[8]  For decisions relying on this definition, *see, e.g., Currie v. Matesanz*, 281 F.3d 261, 266 (1st Cir. 2002); *Swarz v. Meyers*, 204 F.3d 417, 421 (3d Cir. 2000); *Deerwester v. Carter*, 26 F. Supp. 2d 1080, 1082 (C.D. Ill. 1998).

[9]  That a word gains meaning from its context is, of course, the essence of the canon of *noscitur a sociis*. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("a word is given more precise content by the neighboring words with which it is associated"); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001) ("[w]ords that can have more than one meaning are given content . . . by their surroundings").  The Supreme Court, in addition, often has made clear that verb tenses connote meaning.  *See, e.g., Carr v. United States*, 130 S. Ct. 2229, 2236 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.").

[10]  *See Woodford v. Ngo,* 548 U.S. 81, 107 (2006) ("if we have already provided a definitive interpretation of the language in one statute, and Congress then uses nearly identical language in another statute, we will give the language in the latter statute an identical interpretation unless there is a clear indication in the text or legislative history that we should not do so"); *Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 718 n.30 (1980) (a word's "interpretation can be informed by other contexts in which Congress has used it").

U.S.C. § 2254, when it was not filed until after the statute passed.  In so concluding, the Sixth Circuit, applying the Black's definition quoted above, observed that "[i]n ordinary usage a case is pending when a complaint or petition is filed."  *Id.* at 1038.  Other decisions are to like effect.[11]  All these cases well-illustrate that statutory language referring to a matter that is "pending" or to a party that "has pending" a suit is most naturally read to denote a suit already in existence as of the relevant measuring point.

That measuring point, in the case of section 1500, is when the complaint is filed.  This construction of the statute accords with the way that jurisdictional statutes are normally read.  Thus, *Keene* used as the starting point for its analysis the hoary principle that "the jurisdiction of the court depends upon the state of things at the time of the action brought."  *Keene*, 508 U.S. at 207 (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).  "This time-of-filing rule is hornbook law," the Supreme Court has stated, "taught to first-year law students in any basic course on federal civil procedure."  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570-71 (2004).  And, as *Keene* illustrates, this convention has been applied to section 1500.  So observed Judge Lettow in his more recent *Nez Perce* decision, where he pointed out that "[t]he phrase quoted in *Keene* from Chief Justice Marshall's opinion in *Mollan* about jurisdiction attaching at the outset of a suit continues by stating that 'after vesting, [jurisdiction] cannot be ousted by subsequent events.'"  *Nez Perce Tribe*, 101 Fed. Cl. at 145 (quoting *Mollan*, 22 U.S. (9 Wheat.) at 539); *see also Keetoowah Band of Cherokee Indians of Okla. v. United States*, 86 Fed. Cl. 183, 191 (2009).  Accordingly, the plain text of section 1500 is consistent with the normal approach for assessing jurisdiction and inconsistent with defendant's attempt to seize jurisdiction from this court long after it has first been exercised.

Defendant, however, maintains that section 1500 is different.  Noting that the phrase "shall not have jurisdiction" is framed in the negative ("not") and uses the present tense ("shall . . . have), it suggests that Congress intended the statute to apply, if, at any point, a law suit involving the same claim is filed in another court.  But, it is a gross *non sequitur* to glean from these two unremarkable statutory features the remarkable conclusion that section 1500 is not subject to the well-accepted "time-of-filing" rule.

---

[11]  *See United States v. SLM Corp.*, 659 F.3d 1204, 1208 (D.C. Cir. 2011) (construing the phrase "pending action," as used in 31 U.S.C. § 3730(b)(5), as applying only to "an earlier suit"); *Currie v. Matesanz*, 281 F.3d 261, 266 (1st Cir. 2002) (a suit is "pending," as used in the limitations provision of 27 U.S.C. § 2244(d)(2), from "initial filing in the trial court until final disposition on appeal"); *McDonald v. Director, Office of Worker's Comp. Programs*, 897 F.2d 1510, 1513-14 & n. 4 (9th Cir. 1990) (amendment to Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, applicable to "pending" actions, applied only to cases already "begun"); *Chamley v. Gibbons*, 80 P.3d 524, 526 (Or. Ct. App. 2003) (action filed by defendant in case three hours after plaintiff filed her action was not "pending" at the time of the plaintiff's filing for purposes of ORCP 21a(3), which requires dismissal of an action if "there is another action pending between the same parties for the same cause").

First of all, defendant ignores the fact that virtually every Federal statute that extends or withdraws jurisdiction is framed in the present tense, *e.g.*, "shall have" or "shall not have."[12] Accordingly, an exception to the "time of filing" rule for jurisdictional statutes framed in the present tense would, as they say, swallow the rule.  Nor is it unusual for a jurisdictional statute to hinge current jurisdiction *vel non* on the presence *vel non* of some past act.  Read as a whole, that is exactly what section 1500 does.  Indeed, as discussed above, relating a past action to the court's present jurisdiction is grammatically signaled by Congress' use of the phrase "has pending," the tense of which, described by *Nez Perce* as the equivalent of the present perfect tense, refers to "a past action that comes up to and touches the present."  *Dobrova v. Holder*, 607 F.3d 297, 301-02 (2d Cir. 2010) (quoting Chicago Manual of Style ¶ 5.119 (15th ed. 2003)); *Ruth Calderon-Cardona v. J.P. Morgan Chase Bank, N.A.*, 2011 WL 6155987, at *4 (S.D.N.Y. Dec. 7, 2011).  Not surprisingly, then, numerous decisions have held that the normal "time of filing" rule applies to jurisdiction-granting and –denying statutes which employ present-tense language identical, or nearly identical, to that found in section 1500.[13]

---

[12]   *See*, *e.g.*, 28 U.S.C. §§ 1331 (federal question jurisdiction); 1332 (diversity jurisdiction); 1337 (withdrawing jurisdiction as to cases within the exclusive jurisdiction of the Court of International Trade); 1346(a) (Little Tucker Act); 1491(a)(1) (Tucker Act); 1359 (withdrawing jurisdiction where a party is collusively joined); 1491(b)(1) (bid protests); 1502 (withdrawing jurisdiction as to Treaty cases).

[13]   For decisions applying this rule in cases involving 28 U.S.C. § 1332(a), *see*, *e.g.*: *Grupo Dataflux*, 541 U.S. at 570 ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'"); *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").  Defendant's claim is also contradicted, *inter alia*, by *Hood v. Bell*, 84 F.2d 136 (4th Cir. 1936).  In that case, the Reconstruction Finance Corporation (RFC) sued Bell to recover on promissory notes, with federal jurisdiction predicated on the United States' majority ownership of the RFC.  While the action was pending, the RFC transferred the promissory notes to Hood. The district court dismissed the action on jurisdictional grounds, citing 28 U.S.C. § 42, which provided, "[t]he district courts shall not have jurisdiction of any civil action by . . . any corporation on the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."  Act of Feb. 13, 1925, ch. 229, § 12, 43 Stat. 941.  On appeal, the Fourth Circuit reversed, holding that this statute did not deprive the district court of jurisdiction.  It opined:

> It is well settled that jurisdiction depending on diversity of citizenship is not lost by removal or change of citizenship; or by substitution of parties, or by the making of additional parties, or by the reduction of the amount demanded below the jurisdictional amount; or by the transfer of the subject matter of the suit pendent lite to one who is a citizen of the same state as the opposite party.  And there is no more reason to hold that the court loses jurisdiction in a case such as this than in any of [these cases].

Another flaw in defendant's argument stems from its one-sidedness. By defendant's logic, if jurisdiction here is not measured when a suit is filed, one must wonder why a plaintiff in this court cannot avoid section 1500 simply by dismissing the related district court action before defendant files a motion to dismiss. Yet, defendant has vigorously argued that such after-the-fact cures are impossible – that once a suit is filed in this court, dismissal of a previously-filed district court action accomplishes nothing. Indeed, it has not hesitated to invoke section 1500 in cases in which the related district court case was dismissed long before defendant filed any motion in this court. *See, e.g.*, *Petro-Hunt v. United States*, No. 00-512, Memorandum of the United States in Support of Motion to Dismiss at 14 (Fed. Cl. May 31, 2011). Moreover, in responding to arguments in these cases that the dismissal was inappropriate because there was no further prospect for duplicative litigation, defendant has repeatedly cited the rule requiring jurisdiction to be assessed at the time of the filing of the complaint – the same rule that it eschews here.[14] One must hope that the same statutory language does not have two different meanings, based upon which interpretation, in a given case, will most likely lead to a dismissal. In fact, though, a fuller reading of the statute, with all of its language given effect, negates the potential existence of this anomaly – and reveals that defendant's reliance on the "shall not have jurisdiction" language proves too much.

Nor does the canon requiring strict construction of waivers of sovereign immunity compel a reading of section 1500 that goes beyond its linguistic borders. The Supreme Court, in *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008), recently emphasized the limitations of this canon, stating –

> The sovereign immunity canon is just that – a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other

---

*Bell*, 84 F.2d at 137. For similar decisions, *see Rosa v. RTC*, 938 F.2d 383, 392 n.12 (3d Cir. 1991), *cert. denied*, 502 U.S. 981 (1991) (same as to 12 U.S.C. § 1821(d)(3)); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1139 n.58 (7th Cir. 1979), *cert. denied*, 444 U.S. 870 (1979) (same as to Magnuson-Moss Warranty Federal Trade Commission Improvement Act, §§ 101-112, 110(d)(3), 15 U.S.C. § 2310(d)(3)); *Central United Life Ins. Co. v. Estate of Gleason*, 2011 WL 4856164, at *2 n.1 (D. Mont. Oct. 13, 2011) (same as to 28 U.S.C. § 1359).

[14] *See, e.g.*, *Petro-Hunt v. United States*, No. 00-512, Memorandum of the United States in Support of Motion to Dismiss, at 14 (Fed. Cl. May 31, 2011) ("Section 1500 applies here because Petro-Hunt's district court suit was pending when it first filed its complaint in the CFC; it is irrelevant whether those district court claims are still pending today."); *Yakama Nation Hous. Auth. v. United States*, No. 08-839, Memorandum in Support of Motion to Dismiss, at 14 (Fed. Cl. Jan. 13, 2011) ("The jurisdictional analysis is guided by the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought."); *Griffin v. United States*, No. 07-318, Memorandum in Support of Defendant's Motion to Dismiss at 8 (Fed. Cl. Aug. 20, 2007) ("Even though her Title VII claims are no longer pending before the district court, the timing for the § 1500 analysis is the time of filing.").

traditional tools of statutory construction. Indeed, the cases on which the Government relies all used other tools of construction in tandem with the sovereign immunity canon. *See Ardestani v. INS*, 502 U.S. 129, 137 (1991) (relying on the canon as "reinforce [ment]" for the independent "conclusion that any ambiguities in the legislative history are insufficient to undercut the ordinary understanding of the statutory language"); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 682, 685-86 (1983) (relying on the canon in tandem with "historic principles of fee-shifting in this and other countries" to define the scope of a fee-shifting statute).

In that case, the Court concluded that "[t]here is no need for us to resort to the sovereign immunity canon because there is no ambiguity left for us to construe." *Richlin*, 553 U.S. at 590.[15] Accordingly, as to section 1500, "[i]nvocation of that canon thus provides no opportunity for a court either to depart from the ordinary meaning associated with language of a judicial review provision or to erect barriers to the exercise of that review." *Griffin*, 85 Fed. Cl. at 188; *see also Franconia Assocs. v. United States*, 536 U.S. 129, 145 (2002).[16]

In sum, as Judge Lettow aptly stated in his second *Nez Perce* decision, "[t]he government's proffered application of Section 1500 is 'grammatically indefensible,' and cannot be adopted." *Nez Perce*, 101 Fed. Cl. at 145 (quoting *Bush v. United States*, 655 F.3d 1323, 1330 (Fed. Cir. 2011) (en banc)).

**2.**

But what of the statute's legislative history? As will be seen, nothing there supplies the slightest basis to deviate from the statute's plain text. Indeed, aspects of that history reinforce the conclusion reached in *Tecon*.

Of course, it is axiomatic that legislative history is relevant only where statutory language is ambiguous. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004); *see also United States v. Fisher*, 6 U.S. (2 Cranch) 358, 399 (1805) ("Where a law is plain and

---

[15]   *See also Smith v. United States*, 507 U.S. 197, 201-03 (1993) (invoking the sovereign immunity canon only after observing that the claimant's argument was "undermine[d]" by the "commonsense meaning" of the statutory language); *Department of Energy v. Ohio*, 503 U.S. 607, 626-627 (1992) (resorting to the canon only after a close reading of the statutory provision had left the Court "with an unanswered question and an unresolved tension between closely related statutory provisions").

[16]   *See Bowen v. City of New York*, 476 U.S. 467, 479 (1986) ("in construing the statute [the Court] must be careful not to 'assume the authority to narrow the waiver that Congress intended'") (quoting *United States v. Kubrick*, 444 U.S. 111, 118 (1979)); *see also* Gregory C. Sisk, "The Continuing Drift of Federal Sovereign Immunity Jurisprudence," 50 Wm. & Mary L. Rev. 517, 543-44, 574-75 (2008).

unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction."). That is not the case here and nothing in the legislative history can alter this. *See Miller v. Dept. of Navy*, 131 S. Ct. 1259, 1267 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) (declining to consult legislative history when that "history is more conflicting than the text is ambiguous"). Assuming its relevance, though, that history, in some ways, confirms what Judge Lettow's careful parsing of the statutory language reveals – that Congress did not intend to bar a lawsuit from proceeding in this court as long as a similar claim was not already pending before another court at the time that suit was filed.

Before 1855, Congress satisfied monetary claims against the United States by enacting private bills. *See United States v. Mitchell*, 463 U.S. 206, 212-13 (1983). As that process became more cumbersome, Congress, in 1855, created the Court of Claims to "hear and determine all claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States." Act of Feb. 24, 1855, ch. 122, § 1, 10 Stat. 612. Under this statute, however, the court operated merely as an advisory body, making recommendations to Congress, which had final say over whether to pass a private bill to effectuate a decision. *Id.* at §§ 7-9, 10 Stat. 613-14; Wilson Cowen, Philip Nichols, Jr. & Marion Bennett, "The United States Court of Claims, A History," Part II, *reprinted in* 216 Ct. Cl. 1, 13-19 (1978). This system proved increasingly unworkable to resolve a burgeoning number of Civil War claims. Accordingly, in 1863, at the urging of President Lincoln, Congress authorized the Court of Claims to enter final judgments against the United States in the cases covered by the 1855 Act. Act of Mar. 3, 1863, ch. 92, § 3, 12 Stat. 765; Cowen, *supra*, at 20-21.[17]

Remarkably, the same day that Congress passed this legislation, it enacted the Collection of Abandoned Property Act of March 3, 1863, ch. 120, 12 Stat. 820 (1863) (CAPA), which authorized the government to seize property in the Confederate States. Persons claiming ownership of that property could bring action against the United States in the Court of Claims to recover any proceeds from the sale of the property, but were required to prove that they had not given aid or comfort to the rebellion. § 3, 12 Stat. 820. Recognizing the difficulty of satisfying this loyalty requirement, the "cotton claimants" (so-called because their claims related to seized cotton) not only brought a large number of actions against the United States in the Court of Claims, but also parallel tort actions against federal officials in other courts. *See Tohono*, 131 S.

---

[17] In urging the passage of that legislation in his 1862 State of the Union address, President Lincoln uttered these hallowed words – that "[i]t is as much the duty of Government to render prompt justice against itself, in favor of its citizens, as it is to administer the same between private individuals." Cong. Globe, 37th Cong., 2d Sess. App. 2 (1862); *see also Mitchell*, 463 U.S. at 213-14. In 1866, Congress repealed a provision of the 1863 Act that conditioned the payment of judgments rendered by the Court of Claims upon the apportionment of funds by the Treasury, thereby making the judgments of this court's predecessor true judgments. Act of Mar. 17, 1866, ch. 19, § 1, 14 Stat. 9.

Ct. at 1728; *Keene Corp.*, 508 U.S. at 206-07; Paul Frederic Kirgis, "Section 1500 and the Jurisdictional Pitfalls of Federal Government Litigation," 47 Am. U. L. Rev. 301, 303-04 (1997); David Schwartz, "Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents," 55 Geo. L.J. 573, 575-76 (1967) (hereinafter "Schwartz").  Others sued federal officers seeking writs of "replevin" and "detinue," thereby seeking the recovery of the cotton itself.  *See, e.g.*, *Tweed's Case*, 83 U.S. (16 Wall.) 504 (1874); *see also Hepburn & Dundas' Heirs v. Dunlop & Co.*, 14 U.S. (1 Wheat.) 179, 203 n.d (1816) (describing the nature of these writs).  Once Congress became aware of these suits, it monitored them closely, thereby becoming increasingly concerned that certain claimants might receive damages for the loss of their cotton and yet later recover the cotton itself.  *See Matson Navigation Co. v. United States*, 284 U.S. 352, 355-56 (1932); Payson R. Peabody, Thomas K. Gump, Michael S. Weinstein, "A Confederate Ghost that Haunts the Federal Courts," 4 Fed. Cir. B.J. 95, 99-102 (1994) (hereinafter "Peabody").[18]

Responding to this problem, Congress first passed, in March of 1868, legislation drafted by Senator Edmunds of Vermont designed to protect against such double recoveries.  This statute required the Secretary of the Treasury to deposit funds from sales of captured and abandoned property under the CAPA "immediately" into the Treasury.  Act of Mar. 30, 1868, J. Res. 25, § 1, 15 Stat. 251; *see* Cong. Globe, 40th Cong., 2d Sess. 120 (1867).  Such prompt deposit was viewed as ensuring that "the rights of the Government [would be] properly protected" against claims to the funds.  *Id.* at 378 (Sen. Trumbell); *see also id.* at 380 (Sen. Howe).  A separate provision also appropriated funds to defend these suits.  § 3, 15 Stat. 251; *see* Cong. Globe, 40th Cong., 2d Sess. 1466-70, 1489-97 (1868).  According to Sen. Edmunds, the Senate Finance Committee had studied the cotton cases "for months," finding that roughly "one hundred lawsuits" were then pending against the Secretary and his agents "in different parts of the country," with the plaintiffs therein variously seeking specific and monetary relief, *i.e.*, "th[e] very cotton and . . . the proceeds of it."  *Id.* at 1466-68; *see also id.* at 1467-70, 1490-91.

A few months later, Congress' attention shifted to two other bills drafted to address the problems posed by the cotton claimants: H.R. 1131 and S. 164.  On June 1, 1868, Representative Butler of Massachusetts introduced the first of these bills, H.R. 1131, Cong. Globe, 40th Cong., 2d Sess. 2750 (1868), which declared that an action in the Court of Claims was the "exclusive" remedy for claimants whose property had been seized under the CAPA and specified that claimants were therefore "preclude[ed] . . . from suit at common law, or any mode of redress whatever, before any court or tribunal other than [the] Court of Claims," including "suits of trespass, replevin, detinue, or other forms of action" that "are now pending" or may "hereafter be brought."  *Id.* at 3620 (text as introduced); *id.* at 3655, 4449 (amendments).  The next day, Senator Edmunds introduced the amendment to S. 164 that would become section 1500.  *See* S. 164, 40th Cong., 2d Sess. (1868); *see also* Cong. Globe, 40th Cong., 2d Sess. 2769,

---

[18]  As noted by the Supreme Court in *Tohono*, "[t]he jurisdictional bar in § 1500 was enacted in part to address the problem that judgment in suits against officers were not preclusive in suits against the United States."  131 S. Ct. at 1169; *see also Trusted Integration*, 659 F.3d at 1168-69.

3255, 3267.  It was the latter bill that was first enacted by Congress as section 8 of the Act of June 25, 1868, ch. 71, 15 Stat. 77 (the June 25 Act).

Section 8 of the June 25 Act provided:

And be it further enacted, That no person shall file or prosecute any claim or suit in the court of claims, or an appeal therefrom, for or in respect to which he or any assignee of his shall have commenced and has pending any suit or process in any other court against any officer or person who, at the time the cause of action . . . arose, was in respect thereto acting or professing to act, mediately or immediately, under the authority of the United States, unless such suit or process, if now pending in such other court, shall be withdrawn or dismissed within thirty days after the passage of this act.

*Id.*; *see also Coeur d'Alene Tribe v. United States*, 2011 WL 5822177, at *3 (Fed. Cl. Nov. 18, 2011).  In explaining the purpose of this legislation, Senator Edmunds, borrowing from the floor statement he gave in support of the March 1868 legislation, stated –

The object of this amendment is to put to their election that large class of persons having cotton claims particularly, who have sued the Secretary of the Treasury and the other agents of the Government in more than a hundred suits that are now pending, scattered over the country here and there, and who are here at the same time endeavoring to prosecute their claims, and have filed them in the Court of Claims, so that after they put the Government to the expense of beating them once in a court of law they can turn around and try the whole question in the Court of Claims.  The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts.

Cong. Globe, 40th Cong., 2d Sess. 2769 (1868); *see Lan-Dale Co. v. United States*, 85 Fed. Cl. 431, 433 (2009).  Barely a month later, Congress enacted H.R. 1131, as section 3 of the Act of July 27, 1868, 15 Stat. 243 (the July 27 Act), thereby severely curtailing the ability of CAPA claimants to prosecute old suits or file new ones in courts other than the Court of Claims.  *See Lamar v. McCulloch*, 115 U.S. 163, 182-87 (1885) (discussing the scope of this exclusion).[19]

_____

[19]  As enacted, section 3 of the July 27 Act provided, in pertinent part:

that the remedy given in cases of seizure made under [CAPA], by preferring claim in the court of claims, should be exclusive, precluding the owner of any property taken by agents of the Treasury Department as abandoned or captured property in virtue or under color of said act from suit at common law, or any other mode of redress whatever before any court or tribunal other than said court of claims; and in all cases in which suits of trespass, replevin, detinue, or any other form of action may have been brought and are now pending, or shall hereafter be brought against any person for or on account of private property taken by such person as an officer or agent of the United States, in virtue or under color of the act

Both section 8 of the June 24 Act and section 3 of the July 27 Act were incorporated into the Revised Statutes of 1874.  *See* Revised Statutes, Title 13, ch. 21, § 1059, 18 Stat. 196 (1874) (section 3); *id.* at § 1067, 18 Stat. 197 (1874) (section 8); 2 Cong. Rec. 129 (1873) (statement of Rep. Butler).[20]  The 1874 versions of sections 8 and 3 were later reenacted, without significant change, as sections 154 and 162 of the Judicial Code of 1911, respectively.  Act of Mar. 3, 1911, ch. 231, § 154, 36 Stat. 1138; *id.* at § 162, 36 Stat. 139-40.[21]  Thirty-seven years later, as part of a comprehensive revision of the laws, Congress again reenacted section 8 as section 1500 of the

---

> aforesaid, . . . the defendant may and shall plead or allege in bar thereof that such action was done or omitted to be done by him as an officer or agent of the United States in the administration of one of the acts of Congress aforesaid, or in virtue or under color thereof, and such plea or allegation, if the fact be sustained by the proof, shall be, and shall be deemed and adjudged in law to be, a complete and conclusive bar to any such suit or action.

Act of July 27, 1868, § 3, 15 Stat. 243.

[20]  The 1874 version of section 8 dropped the thirty-day savings clause in the original statute and more simply provided:

> No person shall file or prosecute in the Court of Claims, or in the Supreme Court on appeal therefrom, any claim for or in respect to which he or any assignee of his has pending in any other court any suit or process against any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, mediately or immediately, under the authority of the United States.

Revised Statutes, Title 13, ch. 21, § 1067, 18 Stat. 197 (1874).

[21]  Section 162 of the Judicial Code of 1911 stated:

> The Court of Claims shall have jurisdiction to hear and determine the claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under [CAPA and its amendments] where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the owners thereof, on the judgment of said court, and full jurisdiction is given to said court to adjudge such claims, any statutes of limitations to the contrary notwithstanding.

Act of Mar. 3, 1911, ch. 231, § 162, 36 Stat. 1139-40.  As the quoted language indicates, Congress carried this version of section 3 forward in 1911, in part, to continue to exempt cotton claimants from the six-year statute of limitations on filing suit in the Court of Claims.  *See* 46 Cong. Rec. 2165 (1911) (statement of Rep. Moon).

Judicial Code of 1948. *See* Act of June 25, 1948, ch. 646, 62 Stat. 942.[22]  The 1948 legislation made several changes to section 1500, none of which was intended to be significant, *to wit*, it: (i) deleted the phrase "or in the Supreme Court on appeal therefrom" as unnecessary; (ii) added the phrase "against the United States," apparently in order to bar simultaneous actions against the United States, as well as actions against federal officials; and (iii) replaced the phrase "No person shall file or prosecute" with "The Court of Claims shall not have jurisdiction of." *See* Reviser's Notes, 28 U.S.C. 1500, at 1862 (1948) (noting that "[c]hanges were made in phraseology"); H.R.Rep. No. 308, 80th Cong., 1st Sess. A140 (1947); William W. Barron, "The Judicial Code 1948 Revision," 8 F.R.D. 439 (1948).[23]  The 1948 version of section 1500 has been carried forward without significant change.[24]

So what can we deduce from this history?  Several things, actually.  First, in *Keene Corp.*, 508 U.S. at 208-09, the Supreme Court concluded that the original 1868 wording of the statute informs its modern meaning.  And, *Tecon*, of course, looked to this original wording to confirm its order-of-filing rule.  343 F.2d at 949.  Taking its lead from these cases, this court, in *Griffin*, found that the "has pending" language in the current statute referenced only cases filed prior to the filing of a complaint in this court, observing that "[r]eading the "has pending" language [to support the order-of-filing rule] comports with the original language of that section, as passed in 1868, which talked in terms of a suit that an individual "shall have commenced and has pending." *Griffin*, 85 Fed. Cl. at 186-87 (quoting Act of June 25, 1868, ch. 71, 15 Stat. 77). In this regard, it added that "[i]f there were any doubt that the action priming jurisdiction in this court must be filed before a suit is deemed filed here, Congress' use of this second present participle – "shall have commenced" – would seem to dispel it." *Id.*  Other cases focusing upon the original language of the 1868 statute, and the subsequent modifications thereto, have reached the same conclusion.  *See Nez Perce Tribe*, 83 Fed. Cl. at 190; *Marks v. United States*, 24 Cl. Ct.

---

[22]  Section 3 was omitted from this recodification apparently because Congress believed that there no longer was need to keep the statute of limitations on Civil War claims open. *See* H.R. Rep. No. 308, 80th Cong., 1st Sess. A235 (1947) (indicating that section 162 of the 1911 Judicial Code was "[c]overed by [28 U.S.C.] section 2501 of this revision); *see also id.* at A380.

[23]  The Supreme Court has repeatedly recognized that "no change in law should be presumed from the 1948 revision of the Judicial Code 'unless an intent to make such changes is clearly expressed.'" *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 n.4 (1989) (quoting *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957)); *accord, e.g.*, *Keene Corp.*, 508 U.S. at 209 (citing cases); *Tecon*, 343 F.2d at 949; *see also Barron*, 8 F.R.D. at 445-46.

[24]  In 1982, Congress amended the statute to substitute references to the new Claims Court for the old Court of Claims. *See* Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25.  More recently, in 1992, Congress passed legislation substituting "Court of Federal Claims" for "Claims Court." Pub. L. No. 102–572, § 902(a)(1).

310, 316 (1991); *Conn. Dept. of Children & Youth Servs. v. United States*, 16 Cl. Ct. 102, 104 (1989); *Chavez v. United States*, 14 Cl. Ct. 212, 215 (1988).[25]

Second, it is noteworthy that section 1500 was passed in tandem with other legislative responses to the problems posed by the cotton claimants – at least four provisions were enacted on this limited subject. In the court's view, this counsels against stretching the language of section 1500 too far. The history belies the notion "that section 1500 was intended to be an omnibus response to every situation in which defendant might find itself litigating the same claim in two courts." *Griffin*, 85 Fed. Cl. at 190. In particular, section 8 of the June 24 Act, the provision that would become section 1500, and section 3 of the July 27 Act were *in pari materia*. The legislative history suggests that the former was passed principally with an eye toward the one hundred or so CAPA lawsuits that were already filed, which Congress had been carefully monitoring, to require a plaintiff to elect between pursuing their case against the United States in the Court of Claims or continuing to pursue a similar claim against an agent of the government in another court.[26] Of course, in some ways, this was not much of a choice because section 3 vested sole jurisdiction over CAPA cases in the Court of Claims. Unlike section 8, section 3 was plainly forward looking, as it applied broadly to all lawsuits "now pending" and "hereafter brought." Cong. Globe, 40th Cong., 2d Sess. 3620 (1868). The latter language illustrates that, even back in 1868, Congress knew how to write a jurisdiction-denying statute that would apply to later-filed suits, thereby confirming that Congress intended the precursor to section 1500 to mean exactly what it said.

---

[25] It should not be overlooked that, in stating the statute would be triggered only if the claimant "shall have commenced and has pending" a related case, the original 1868 language of the statute also contradicts defendant's claim that a later-filed district court action ousts this court of jurisdiction. The phrase in the current statute upon which defendant anchors this claim – "shall not have jurisdiction" – was not added to the statute until 1948. As noted above, however, the addition of this language was not intended to change the statute's original meaning.

[26] As noted in *Tecon*, 343 F.2d at 949, the 1868 statute precluded individuals not only from filing, but from "prosecut[ing]" a case in the Court of Claims, as well as "on appeal therefrom." The latter clause would have been superfluous had the existence of another case involving the same claim been enough to require the immediate dismissal of a subsequent Court of Claims case. Moreover, the statute gave such individuals thirty days within which to dismiss or withdraw the lawsuits filed in courts other than the Court of Claims, again suggesting that nothing about the timing of those lawsuits was determinative under this provision. Features such as these caused Mr. Justice Stone, writing on behalf of a unanimous Supreme Court in *Matson Navigation Co. v. United States*, 284 U.S. 352 (1932), to observe that "the declared purpose of this section . . . was only to require an election between a suit in the Court of Claims and one brought in another court against an agent of the Government, in which the judgment would not be res adjudicata in the suit pending in the Court of Claims." *Id.* at 355-56; *see also* Schwartz, *supra* at 578.

In many ways, though, this extensive legislative history is perhaps most remarkable for what it does not say – Congressional silence to which this court must "listen attentively." Felix Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 536 (1947) (hereinafter "Frankfurter"). The history indicates, to be sure, that Congress generally intended to avoid the duplication of suits. But, nothing therein remotely suggests that this goal was all-encompassing or had to be accomplished in any specific way, particularly one that would command a surpassingly broad interpretation of the phrase "has pending." To put it another way, the legislative history contains no "clearly expressed . . . intention" that negates the plain statutory construction performed nearly a half century ago in *Tecon*. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *see also Whitfield v. United States*, 543 U.S. 209, 216-17 (2005) ("Where Congress has chosen **not** to do so, we will not override that choice based on vague and ambiguous signals from legislative history." (emphasis in original)). It suggests that Congress' primary desire was not to defeat the actions filed in this court, where jurisdiction was proper, but rather to defeat those filed in the district courts, where jurisdiction was lacking. Defendant's interpretation of section 1500 turns Congress' intent on its head, preserving a district court action (where jurisdiction is otherwise lacking) at the expense of one filed in this court (where jurisdiction is otherwise proper). Could this be what Congress *sub silentio* intended? *Tecon* thought not, observing that "the history of section 1500 is devoid of even an intimation" that Congress intended to "interfere with the orderly administration of justice" in this court, and instead reflects a "legal evolution" that supports the plain meaning construction of the current statutory language." *Tecon*, 343 F.2d at 946; *see also Nez Perce Tribe*, 83 Fed. Cl. at 189-90; *Chavez v. United States*, 14 Cl. Ct. 212, 215 (1988); Peabody, *supra*, at 100.[27]

---

[27]   As it did in *Keene*, 508 U.S. at 212, the Supreme Court presumes that Congress is "aware of . . . earlier judicial interpretations and, in effect, adopt[s] them" when it reenacts or amends a statute without relevant change. "[T]he claim to adhere to case law is generally powerful once a decision has settled statutory meaning," particularly where many years have passed since the relevant judicial interpretation "without any action by Congress to modify the statute." *Shepard v. United States*, 544 U.S 13, 23 (2005). As such, it is telling that since *Tecon* was decided, the Congress has periodically reviewed this court's jurisdiction, but has not seen fit to legislatively overrule *Tecon*'s interpretation of section 1500. In 1982, Congress undertook a wholesale review of the Court of Claims and its jurisdiction in the Federal Courts Improvement Act, Pub. L. No. 97-164, 96 Stat. 25. That statute, *inter alia*, created this court to assume the trial jurisdiction of the Court of Claims. *See Mitchell*, 463 U.S. at 228 n.33. Yet, even as it reconsidered this court's entire jurisdictional scheme and, in particular, the relationship between this court's jurisdiction and that of the district courts, Congress made no substantive changes to section 1500. Perhaps, Congress simply did not know about that statute" Not so. Indeed, one of the reports accompanying the bill (H.R. 3806) that would eventually become the 1982 Act had this to say about section 1500:

> [U]nder section 1500, 1501, and 1502, the Claims Court does not have jurisdiction of the following: Any claims in which the plaintiff or plaintiff's assignee had a claim against the United States pending in any other court; any claim for a pension; and any claim against the United States growing out of or

The legislative history of section 1500 thus avails defendant naught.  If anything, it provides further evidence that *Tecon* was correctly decided.

### 3.

Nor do broad policy considerations countenance defendant's "after-filed" rule.

First, it is highly debatable whether such broad policy considerations should play much, if any, role here.  Nearly eighty years ago, the Supreme Court, in dealing with the precursor of section 1500, made short shrift of policy arguments like these in *Matson Navigation*.  Thus, in rejecting the claim that the statute should be interpreted "to prevent the prosecution at the same time of two suits against the government for the same cause of action," the Court stated that "[a]s the words of the section are plain, we are not at liberty to add to or alter them to effect a purpose which does not appear on its face or from its legislative history."  *Matson Navigation*, 284 U.S. at 356; *see also Corona Coal*, 263 U.S. at 540.  Later, the Supreme Court made similar observations in *Keene*, contending that the "proper theater" for policy arguments was Congress.  *Keene*, 508 U.S. at 217-18; *see also Johns-Manville Corp.*, 855 F.2d at 1565; *Forsgren v. United States*, 73 Fed. Cl. 135, 141 (2006).  In the court's view, the same fate ought to await the arguments defendant now makes, which seek to wield ill-defined policy goals to withdraw jurisdiction Congress has otherwise conferred on this court.  After all, as a counterbalance to the notion that waivers of sovereign immunity should be narrowly construed, it is well-established that courts are "vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them."  *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").  And, the Supreme Court has followed the latter principle in refusing to rely on policy considerations either solely as the basis for limiting a court's jurisdiction or as a reason to construe an existing statutory provision beyond what its terms require.[28]

---

dependent on any treaty with foreign nations.  These provisions are identical to existing law.

H.R. Rep. No. 96-1300, at 37 (1980).  This passage is also notable because, in describing the statute as applying to claims in which a plaintiff "had a claim against the United States pending in any other court," Congress appears to have read section 1500 the same way as the court did in *Tecon*, that is, as referring only to lawsuits pending as of the date a complaint is filed in this court.

[28]  *See, e.g.*, *Marshall v. Marshall*, 547 U.S. 293, 298-99 (2006); *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 (2002) ("we will not presume that the statute means what it neither says nor fairly implies"); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 493-94 (1991); *New Orleans Pub. Serv. Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 829 n.7  (1986).

*Tohono* is not to the contrary. There, the Supreme Court focused on an entirely different prong of the statute – "what it means for two suits to be 'for or in respect to' the same claim." *Tohono*, 131 S. Ct. at 1727. As it had in *Keene*, the Court carefully examined the "for or in respect to" language. While finding that this clause admitted multiple interpretations, the Court ultimately concluded that the "in respect to" part thereof suggested a "broad prohibition." *Id.* at 1728. The court opined that, among alternatives, a broader construction of the "for or in respect to" language "is the more reasonable in light of the statute's use of a similar phrase in a way consistent only with factual overlap." *Id.* The latter reference was to the portion of the statute that bars actions in this court "even where the other action is not against the Government but instead against a 'person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under authority of the United States.'" *Id.* (quoting 28 U.S.C. § 1500).

Here, by comparison, neither the plain meaning of the "has pending" language, nor its statutory context, supports the notion that section 1500 is triggered by after-filed district court actions. This distinction is important because it was only after conducting its linguistical analysis that *Tohono* observed that its interpretation of the statute – that two suits are for in respect to the same claim when they are based on substantially the same operative facts – was supported by the "clear" purpose of the statute, *to wit*, the "need to save the Government from burdens of redundant litigation." *Id.* at 1730. Nothing in the Court's opinion suggests that, in a case like this, it would invoke this same broad purpose not in choosing between two possible interpretations of the statute, but rather in rejecting and essentially redrafting portions of the statute that are relatively clear. The Court could accomplish the latter only by the radical abandonment of its longstanding precedents, which make plain that, in construing a statute, a judge "'must not read in by way of creation.'" *Jones v. Bock*, 549 U.S. 199, 216 (2007) (quoting Frankfurter, *supra*, at 533).[29]

---

[29] The language quoted by Chief Justice Roberts in *Jones* comes from Justice Frankfurter's seminal article on statutory construction. The full passage from whence this sentence comes bears quotation at length:

> "[T]he courts are not at large . . . . They are under the constraints imposed by the judicial function in our democratic society. As a matter of verbal recognition certainly, no one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature . . . . A judge must not rewrite a statute, neither to enlarge nor to contract it. Whatever temptations the statesmanship of policy-making might wisely suggest, construction must eschew interpolation and evisceration. He must not read in by way of creation. He must not read out except to avoid patent nonsense or internal contradiction . . . .

> [T]he only sure safeguard against crossing the line between adjudication and legislation is an alert recognition of the necessity not to cross it and instinctive, as well as trained, reluctance to do so."

Even if policy considerations should play a bit part in this dispute, it is far from clear that stretching the language of section 1500 to fit cases like this will, in the long haul, reduce redundant litigation.  So far as this court can tell, the Supreme Court, in *Tohono*, had the benefit neither of any evidentiary or empirical record as to whether particular constructions of the statute would promote this goal, nor of any evidence from which to conclude that further broad interpretations of section 1500 that lead to the dismissal of a given case would, in the majority of instances, reduce duplicative suits.  There are, as it turns out, significant reasons to think otherwise.

For one thing, this court's experience reflects that, in the wide majority of instances where two related suits are filed in different courts, one of them is stayed.[30]  That is what happened here, and likewise in many of the tribal trust cases that, until recently, were pending in both this court and a district court.  To this court's knowledge, situations in which two related cases are both being actively litigated simultaneously are rare, limited in this arena perhaps to debates over whether a given case belongs in this court under the Tucker Act, 28 U.S.C. § 1491, or in the district courts under the Administrative Procedures Act, 5 U.S.C. § 702 (as construed by the Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988)).  Thus, at least in terms of avoiding duplicative motion practice, discovery and trial, the concerns raised by defendant in this case are more hypothetical, than real.  On the other hand, a persuasive case can be made that if defendant is successful in expanding the reach of section 1500, the result might be more, not less, duplicative litigation, as a couple of examples illustrate.

---

Frankfurter, *supra*, at 535; *see also Morrison v. Nat'l Australia Bank Ltd.*, 130 S.Ct. 2869, 2880 (2010) (rather than courts' "divining what 'Congress would have wished' if it had had addressed the problem[, a] more natural inquiry might be what jurisdiction Congress in fact thought about and conferred" (quoting *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 32 (D.C. Cir. 1987)).

[30]  For examples of such stays, *see Petro-Hunt, LLC v. United States*, Order No. 00-512 (Fed. Cl. Nov. 2, 2000) (stay pending resolution of district court quiet title action); *Bibb v. United States*, Order No. 90-3915 (Fed. Cl. Feb. 2, 2009) (stay pending condemnation action); *Reunion, Inc. v. United States*, Order No. 09-280 (Fed. Cl. May 11, 2010) (stay pending resolution of government declaration of taking in district court); *Westland Meat Co., Inc. v. United States*, Order No. 09-198 (Fed. Cl. Aug. 3, 2010) (stay pending false claims act case in district court).  In all these cases, defendant urged that the stay be granted.  Of course, defendant is not alone in wanting to minimize duplicative litigation.  *See Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); *Eastern Shawnee Tribe v. United States*, 582 F.3d 1306, 1311 (Fed. Cir. 2009), *vacated on other grounds*, 131 S. Ct. 2872 (2011) (noting that "the government's interest in avoiding duplicative proceedings could be addressed by staying the Court of Federal Claims proceedings pending the outcome of the district court proceedings").

Consider a claimant which believes the United States has taken a mineral interest it holds on Federal land, requiring just compensation to be paid under the Fifth Amendment.  In the past, defendant has argued that the determination whether such a mineral interest exists should be made before any ruling on the alleged takings – a logical view – and that the primary jurisdiction for making this determination lies with the United States Department of the Interior (Interior).  Yet, it often takes Interior a number of years to determine whether to issue a patent.  *See, e.g.*, *Kent Bush v. United States*, Order No. 92-391L (Fed. Cl. July 22, 2002) (reflecting a delay of more than ten years in obtaining resolution of a mineral claim).  In the past, this court, nevertheless, has stayed takings actions involving such interests to await not only Interior's decision, but the result of any subsequent district court litigation challenging that decision.  But, as indicated by its counsel at oral argument, defendant now takes the view that the filing of such a district court challenge would prime this court of jurisdiction over the takings action under section 1500 – that is, that under *Tohono*, such a district court challenge involves "substantially the same operative facts" as the takings action and triggers section 1500 even if that district court challenge is filed after suit in this court is filed.  *See* Oral Argument of Oct. 26, 2011, Argument of Jared Pettinato at 2:44:45.  Defendant, moreover, believes that the statute of limitations on filing a takings action in this court, *see* 28 U.S.C. § 2501, is not tolled while Interior decides whether the plaintiff owns a mineral interest.  *See generally, John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134-39 (2008).

If defendant is right and Interior continues to take years to resolve mineral interest claims, the alleged owner of such an interest who has a takings claim could face a Morton's Fork – a choice between equally unpleasant alternatives.  If it waits for Interior to render a decision before filing suit in this court, the statute of limitations might run – indeed, it almost certainly will run if the claimant is forced to challenge an adverse decision in a district court before filing here.  If the claimant instead files suit in this court and the court stays the matter pending an agency decision, but Interior ultimately denies that a mineral interest exists, any attempt by the claimant to seek judicial review of that decision undoubtedly will cause defendant to move to dismiss the action here under section 1500.  Faced with these unpalatable options, a putative claimant might opt to file suit in this court and litigate the existence of its mineral interest simultaneously before this court and Interior (the latter in case this court is found to lack the authority to declare such an interest).  This would not only leave defendant litigating complex questions regarding this court's jurisdiction that have been avoided to date, but also raises the prospect of having dueling proceedings – one before this court and another before Interior, presumably the sort of duplicative litigation defendant wants to avoid.  But, more is troubling here:  For, if defendant is right, a real threat exists that the claimant in question, despite the promise of the Fifth Amendment, may find itself denied any relief whatsoever – with section 1500 blocking the already narrow channel between the Scylla of the statute of limitations and the Charybdis of the delay associated with having a mineral interest declared.[31]  While defendant

---

[31]  A simple example illustrates this proposition:  Say that defendant prevented a plaintiff from accessing its alleged mineral interest on August 1, 2010.  If defendant is correct, then, a takings action would accrue on that date, triggering the six-year statute of limitations in 28 U.S.C. § 2501.  But, according to defendant, before the plaintiff can file such a suit, it must

claims that this is Congress's will, this court cannot conceive that Congress intended this when it enacted the 1868 statute or any of the successor versions of what would become section 1500.[32]

_____

obtain a ruling from Interior that it possesses a mineral interest. If past is prologue, it may take Interior more than six years to rule on that issue. If this happens and the plaintiff does not file a takings action before August 1, 2016, it will be barred from filing that suit by the statute of limitations. But, what if the plaintiff instead files suit in this court prior to August 1, 2016? In that instance, if Interior denies the plaintiff a mineral patent on August 2, 2016, the plaintiff is left with a conundrum – if it does not challenge Interior's decision, it loses the takings action because it will be viewed as lacking the requisite property interest; but, if it files suit to challenge Interior's decision, then, if defendant is right, the plaintiff's takings action will be dismissed and it will be unable to file a new suit that is timely.

[32] Defendant's view of the law – which requires some claimants to forfeit district court review of agency decisions in order to maintain jurisdiction in this court – clashes with the Supreme Court's holding in *Pennsylvania R.R. Co. v. United States*, 363 U.S. 202 (1960). In that case, the plaintiff railroad sued in the Court of Claims to recover an underpayment of shipping charges. In defense, the United States challenged the validity of the relevant tariff. The Court of Claims stayed the case and referred the issue regarding the tariffs to the Interstate Commerce Commission (ICC), which had primary jurisdiction over that question. After the ICC struck down the tariff, the railroad sought judicial review of the ICC order in district court. *Id*. at 203. The United States then moved the Court of Claims to dismiss the case under section 1500. *Id*. at 203-04. The Court of Claims denied this motion and instead lifted the stay and entered judgment consistent with the ICC's order. *Id*. at 204. The Supreme Court reversed. While noting that the United States had not challenged the Court of Claims' ruling on section 1500, the Supreme Court, nonetheless, held that it was error for the Court of Claims to render judgment based on the ICC's ruling, instead of staying its proceeding pending district court review of the ICC's order. Rejecting the notion that the railroad could be "held bound by the Commission's order although completely denied any judicial review of that order," *id*., the Supreme Court reasoned:

> [W]e conclude that the Railroad was entitled to have this Commission order judicially reviewed. We have already determined, however, that the power to review such an order cannot be exercised by the Court of Claims. That jurisdiction is vested exclusively in the District Courts. . . . It necessarily follows, of course, that since the Railroad had a right to have the Commission's order reviewed, and only the District Court had the jurisdiction to review it, the Court of Claims was under a duty to stay its proceedings pending this review.

363 U.S. at 205. In cases like the mineral interest example described above, adoption of defendant's position in this case could lead exactly to the result that the Supreme Court rejected in *Pennsylvania R.R.*, *to wit*, having the claimant "held bound by [Interior's] order although completely denied any judicial review of that order." More broadly, it should not be overlooked that if defendant is right about the scope of section 1500, then the Supreme Court was wrong in

Another example of why defendant's expansive interpretation of section 1500 may backfire comes straight from the pages of *Tecon*. Recall, that in that case, it was the plaintiff who was arguing that its filing of a subsequent district court case deprived this court of jurisdiction and the defendant who was arguing otherwise. Defendant urged the latter position because it believed that a plaintiff should not be able to use the filing of a district court action to restart its case over from scratch. Imagine, then, a situation where a case like this one goes to trial and, for a variety of reasons, the plaintiff anticipates that it will lose. Under defendant's view, nothing would prevent that plaintiff from then filing a district court case seeking an accounting, thereby triggering a dismissal, without prejudice, under section 1500.[33] The plaintiff could then proceed anew in the district court, having used this court as a place to conduct not a trial, but a "trial run" – the plaintiff would have its discovery from this case, a set of "draft" rulings from this court to guide its presentation, and even knowledge as to how particular witnesses will perform on the stand. *Cf. Tohono*, 131 S. Ct. at 1730 (noting that one purpose of the statute is to avoid duplication of discovery and the preparation and examination of witnesses). Under this scenario, there would not be the glancing overlap of cases that we have now, but rather a situation in which two full blown trials are conducted – certainly, the worst form of duplication imaginable – and likely the reason why defendant so many years ago wisely argued against the position that it espouses now. Asked about this scenario during oral argument, defendant's counsel indicated that the anomalous result described was dictated by Congress. This court thinks not.

Now, this is not to say that this court's experiences and observations should provide any normative or empirical basis for construing the statute in question. *Per contra*. The focus of the decision here remains squarely on *Tecon*. The foregoing discussion thus denies very little, except to illustrate the considerable hazards of construing section 1500 through the policy prism of an individual case with its own idiosyncratic facts – to show that a distended interpretation that seemingly produces a sensible result in one case may yield a highly undesirable denouement in the next. That unpredictability stems from the fact that section 1500 is part of a complex jurisdictional mosaic, making any debate over attaining a policy goal, even one so lofty as avoiding duplicative litigation, irresolvable solely by reference to a single decisional tile.[34] At

---

ordering the Court of Claims to suspend its proceedings awaiting the result of the district court challenge to the ICC ruling.

[33] There is little debate that because they involve subject matter jurisdiction, dismissals triggered by section 1500 are without prejudice. *See Dico, Inc. v. United States*, 48 F.3d 1199, 1204 (Fed. Cir. 1995); *Samish Indian Nation v. United States*, 58 Fed. Cl. 114, 123 (2003) ("a dismissal under § 1500 is without prejudice"); *Conn. Dept. of Children & Youth Servs. v. United States*, 16 Cl. Ct. 102, 106 (1989).

[34] Commenting on this point in *Griffin*, this court stated:

[T]he policy interests that have been associated with section 1500 seem to proceed from the notion that it usually will be obvious in which court a particular claim lies. That might have been true in 1868 for the cotton claimants, but it is

- 25 -

least, a case-specific approach at recrafting the statute through judicial interpretation raises the specter of unforeseeable and unintended consequences.[35]  At worst, the apotheosis of defendant's policy seemingly turns a blind eye to those who are harmed by government conduct.  Speak, if you will, then of the desire to avoid duplicative litigation.  But, if there is to be a policy debate over how to attain this goal, let it be global, and let Congress be the one to conduct it.  *See Berry*, 86 Fed. Cl. at 29.  As Judge Lettow observed in another case, "[a]s a jurisdictional statute, Section 1500 ought to be construed with fidelity to its terms . . . and neither expanded nor contracted to reflect policy preferences that may or may not have led to their enactment."

---

worlds apart from the statutory landscape that litigants must navigate today, which is marked by multiple waivers of sovereign immunity whose boundaries are sometimes in dispute.  *Compare Bowen v. Massachusetts*, 487 U.S. 879 . . . (1988) *with Cons. Edison of N.Y. v. U.S. Dept. of Energy*, 247 F.3d 1378 (Fed. Cir. 2001); *see also Cobell v. Kempthorne*, 2008 WL 4151330 (D.D.C. Sept. 4, 2008).  The uncertainty engendered by this system can lead to what Judge Leventhal once described as games of "jurisdictional badminton," with litigants sometimes assuming the unenviable role of the shuttlecock.  *See Investment Co. Inst.*, 551 F.2d at 1283 (Leventhal, J., concurring) (quoting *Natural Resources Defense Council, Inc. v. Environmental Protection Agency*, 512 F.2d 1351, 1361 (D.C. Cir.1975) (Skelly Wright, J., dissenting in part)).

*Griffin*, 85 Fed. Cl. at 193-94.

[35]  One is reminded of the Indian fable of the six blind men who were asked to determine what an elephant looked like by feeling different parts of the animal's body.  One man who felt the leg said the elephant was like a pillar; another who felt the tail, said the elephant was like a rope; the one who felt the trunk said the elephant was like a tree branch; the one who felt the ear said that it was like a hand fan; the one who felt the belly said the elephant was like a wall; and the one who felt the tusk said the elephant was a solid pipe.  In most versions of the story, the men end up arguing who is right.  A Nineteenth Century poet, John Godfrey Saxe, captured the moral of this fable stating:

> And so these men of Indostan, disputed loud and long,
>   each in his own opinion, exceeding stiff and strong,
> Though each was partly in the right, and all were in the wrong!
>
> So, oft in theologic wars, the disputants, I ween,
>   rail on in utter ignorance, of what each other mean,
>   and prate about the elephant, not one of them has seen!

John Godfrey Saxe, The Poems of John Godfrey Saxe 260-61 (1868).

- 26 -

*d'Abrera*, 78 Fed. Cl. at 56 n.10 (citing *Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 405 (1995)).[36]

## C.

In a last ditch effort to defeat plaintiff's case, defendant claims that *Tecon* is distinguishable from this case. It argues that the "order of filing rule" does not apply where the subsequent district court complaint is filed on the same day the complaint is filed in this court. There is a split of authority in this court on this proposition, albeit one that is far from balanced. One decision has adopted the "same day" *per se* rule defendant proffers here. *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 263-72 (2008), *aff'd*, 426 Fed. Appx. 916 (Fed. Cir. 2011). But, a fleet of other decisions – decided before and after *Tohono* – flatly reject this "same day" rule.[37] The court believes that the latter decisions have the better of the argument.

Arguably, *Passamaquoddy* is better viewed as advocating a rule of necessity, triggered when evidence is lacking as to which of the two complaints was filed first, rather than a universal "same day" rule that would apply when the timing of lawsuits is actually known. *See Berry*, 86 Fed. Cl. at 28; *cf. Coeur d'Alene Tribe v. United States*, 2011 WL 5822177, at *9 (Fed. Cl. Nov. 11, 2011) (treating both complaints as simultaneously filed "where it is not possible to determine the exact sequence of filing"); *Lan-Dale Co.*, 85 Fed. Cl. at 434 ("[Plaintiff] has at least twice declined an invitation to show that the Court of Federal Claims suit was filed before the Arizona District Court suit, leaving the [c]ourt with no alternative but to find that that the suits were filed simultaneously."). Viewed in these terms, it is easier to understand why *Passamaquoddy* might adopt the approach employed by the Federal Circuit in *United States v. County of Cook*, 170 F.3d 1084 (Fed. Cir. 1999), which involved simultaneously filed claims that arose, under operation of law, because of a transfer under 28 U.S.C. § 1631. *See Passamaquoddy*, 82 Fed. Cl. at 268-69.[38]

---

[36] Defendant argues that this court is not free to engraft an "exception" to this statute "to remove apparent hardship." But, reading section 1500 not to bar a suit in this court when a later suit is filed in a district court does not create an "exception" to the statute. Rather, it simply gives effect to the ordinary meaning of the text of the statute.

[37] *See, e.g.*, *The Haudenosaunee v. United States*, 2009 WL 775399, at *1 (Fed. Cl. 2009); *Berry*, 86 Fed. Cl. at 27-30; K*eetoowah Band of Cherokee Indians in Okla. v. United States*, 86 Fed. Cl. 183, 191 (2009); *Nez Perce Tribe v. United States*, 83 Fed. Cl. at 191; *Salt River Pima-Maricopa Indian Cmty. v. United States*, 2008 WL 1883170, at *4-5 (Fed. Cl. Apr. 24, 2008); *Ak-Chin Indian Cmty. v. United States*, 80 Fed. Cl. 305, 308 n.4 (2008); *Breneman v. United States*, 57 Fed. Cl. 571, 575-77 (2003).

[38] Title 28, section 1631 states that, upon transfer, "the action . . . shall proceed as if it had been filed in . . . the court to which is transferred on the date upon which it was actually filed in . . . the court from which it is transferred." 28 U.S.C. § 1631. *County of Cook* treated claims transferred to the Court of Federal Claims as filed simultaneously with those in the district court and held that such simultaneous filings triggered section 1500. 170 F.3d at 1090.

The analogy to *Cook County*, however, falls entirely apart if, as is the case here, the district court lawsuit plainly was filed after a complaint was filed in this court. In the latter situation, the statutory language of section 1500 does not allow a court to disregard the respective timing of the complaints, any more than it allows a court to dismiss a case based upon a district complaint that was not pending at the time the suit was filed. *See Keetoowah Band*, 86 Fed. Cl. at 191.

No prior case in the Court of Claims holds otherwise, contrary to defendant's claims. Cases like *British American*, 89 Ct. Cl. 428 (1939), and *National Cored Forgings*, 132 F. Supp. 454 (Ct. Cl. 1955), did not discuss the sequence of filings in dismissing suits involving claims that were also involved in district court complaints filed the same day. *See British Am.*, 89 Ct. Cl. at 438; *Nat'l Cored Forgings*, 132 F. Supp. at 458-59. *Hobbs*, which is also cited by defendant, did not involve same-day filed claims at all. 168 Ct. Cl. at 646. Thus, as the Court of Claims itself held in *Tecon*, 343 F.2d at 950, these cases are *sui generis*. *See Keetoowah Band*, 86 Fed. Cl. at 190-91; *see also Brown v. United States*, 358 F.2d 1002, 1005 (Ct. Cl. 1966) (per curiam) (holding that these cases do not call for a different result than was reached in *Tecon*). Even if it could, this court sees no reason to disagree with this binding precedent.

## III.   CONCLUSION

The court need go no further. Defendant sees *Tecon* rendering section 1500 moribund. Yet, it has not done so over nearly half a century. A dozen or so recent dismissals in this court, indeed, attest to the statute's continuing viability.[39] The legislative history of section 1500 and the other CAPA-related provisions, most notably section 3 of the July 27 Act, teaches that Congress believed that defendant should bear some responsibility in protecting itself from duplicative litigation by enforcing vigorously this court's exclusive jurisdiction. Given this, it is difficult to fathom why defendant, if it is truly concerned about duplicative litigation, has allowed certain misfiled tribal trust cases to linger in the district courts.[40] Of course, if, after the

---

[39]   *See, e.g.*, *Vero Technical Support, Inc. v. United States*, 94 Fed. Cl. 784 (2010); *Low v. United States*, 90 Fed. Cl. 447 (2009); *Woodson v. United States*, 89 Fed. Cl. 640 (2009); *Lan-Dale Co*, 85 Fed. Cl. at 431.

[40]   Defendant has long-believed that the district courts lack jurisdiction over tribal trust matters like the case at issue. *See, e.g., Cobell v. Babbitt*, No. 1:96CV01285 RCL, Defendant's Consolidated Motion and Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Claim for Retrospective Relief (D.D.C. June 30, 1998) (arguing, *inter alia*, that the APA does not authorize a suit for an accounting); *see also* Notice, *Kaw Nation of Okla. v. United States*, No. 06-934L (Nov. 25, 2011) (confirming this remains defendant's view). Nevertheless, defendant leaves the impression that, jurisdictionally speaking, it is hamstrung by the views of the regional circuits as to whether a given case is more properly brought under the Tucker Act or the APA. But, of course, if defendant moved to transfer these district court cases to this court under 28 U.S.C. § 1631, the review of such jurisdictional questions would be within the exclusive jurisdiction of the Federal Circuit. *See* 28 U.S.C. § 1292(d)(4)(A); *see also Acceptance Ins. Cos., Inc. v. United States*, 503 F.3d 1328, 1332 (Fed. Cir. 2007).

corresponding cases in this court are dismissed, defendant goes back and obtains the dismissal of these district court cases, it will have succeeded in reducing the number of suits involving these same tribal claims not from two to *one*, mind you, but from two to ***none***.  *See Eastern Shawnee Tribe*, 582 F.3d at 1311.[41]  In this case, the court cannot subscribe to defendant's new math.

To conclude, defendant offers no textual, contextual, historical or purposive justification for its broad reading of the phrase "has pending" – save the unbridled desire to avoid all forms and degrees of what it believes (for the moment) is duplicative litigation.  Even if the court were convinced by the latter policy argument, it would be faced with the contrary precedent in *Tecon*, the binding effect of which remains unaffected after *Tohono*.  The court, therefore, **DENIES** defendant's motion to dismiss.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[41]   In most of these cases, the statute of limitations on filing a new suit in this court has long since run.